CLEM JOHNSON, Landlord, *v.* FRED PEMBERTON, Tenant.

Municipal Court of the City of New York, Borough of The Bronx, March 3, 1950.

*Camardella, De Maio, Hughes & Raphael* for landlord.

*Bertha Schwartz* for tenant.

Quinn, J. The landlord, as owner of the real property known as 641 East 169th Street in the borough of The Bronx, brings this summary proceeding to recover possession of five rooms on the fourth floor, occupied for dwelling purposes only, known as apartment 4W in these premises, for nonpayment of rent in the sum of $36 due and payable on the tenth day each of the months of September, October, November and December, 1949.

It is undisputed that a fire of undisclosed origin occurred in the tenant's apartment on August 10, 1949. It is satisfactorily established by the proof that this fire caused extensive damage to the demised premises. As a result of the fire, and no doubt as an incident to the careful scientific methods of confining and extinguishing the blaze, a process approaching demolition, employed by the fire department of the city of New York, there were great gaping holes in the surface of walls and ceilings, the floors were much scarred and the whole decor one of seared, smoke-stained squalor with considerable deposits of debris heaped and strewn throughout the apartment.

In the halcyon days of an ample supply of housing accommodations the tenant might well have turned his back on the whole wretched ruin and, with his wife and small children, faced resolutely forward to the resumption of family life in fresher quarters, secure from further liability to his old landlord for rent under the protective provisions of section 227 of the Real Property Law.

But if the tenant on August 10th on surveying the wreckage of his quondam holding made any such right about, he came face to face with a housing shortage of such intensity and proportions as to constitute a grave public emergency; a fact of which the Congress of the United States, the Legislature of the State of New York and the council of the city of New York have long and repeatedly taken official cognizance and our courts judicial notice.

Thus under the duress of unalterable circumstances the tenant had no choice, after the fire, but to lead his brood back

to his whilom apartment and, picking a path through mounds of fire-rubbish, seek the most nearly habitable corner of this dismal, reeking waste as at least some semblance of shelter from the less penetrating elements. This he did. With a fortitude born of desperation the tenant and his wife made shift as best they could and as only the homeless can. Showing a genius for improvisation and a patient endurance rivalling that of their displaced brothers and sisters in the bombed-out cities of Europe, they adapted a onetime bedroom into a whimsical sort of refuge where the family could at least make common resort for the crudest of nightly lodging. Without toilet, cooking or heating facilities; without water supply, gas or electricity, the tenant and his family made camp in this corner of a cave.

These were the conditions, unalleviated in the slightest degree, which continued from August 10th until September 26th when the landlord made his first small gesture towards relieving the plight of the tenant. On that date and for two days thereafter the landlord re-entered and set his workmen to removing the fire debris which had served as an effective barrier in excluding the tenant from the use of all but one corner of his erstwhile five-room apartment. No work of repair was undertaken at this time, nor was the restoration of the facilities, essential to the use of the apartment for dwelling purposes, begun. Indeed the magnitude and persistence of the landlord's neglect in this latter respect can be gleaned from the fact that in October, when the tenant summoned him to Magistrate's Court for a violation of his duty to repair under section 78 of the Multiple Dwelling Law, he had only reached the stage of pleading for further time in which to commence performance. Thereafter and through November and December the work of repair went on sporadically, but it proceeded in such dilatory fashion and with such desultory effort that on the trial of this proceeding in January, 1950, there were still some minor items unfinished, including a part of the heating facilities.

The statute and common law of the State of New York afford the tenant no means of escaping liability for the full rent so long as he retained possession of the apartment. Section 227 of the Real Property law entitles the tenant to exercise an option, either to quit and surrender the premises or remain in possession. The mere fact of destruction did not terminate the lease. Unless the tenant exercised the option and effected

a full and absolute surrender of the premises he continued liable for the payment of rent. (*Smith* v. *Kerr*, 108 N. Y. 31; *Plymouth Estate, Inc.*, v. *Keery*, 190 Misc. 819.)

The defense of constructive eviction asserted by the tenant is without avail unless there be " a complete abandonment of possession by the tenant ". (2 McAdam on Landlord and Tenant [3d ed.] § 406, p. 1297, and cases cited.) While it may be true that after a lapse of a month the continued failure of the landlord to unclutter and repair ripened into circumstances which in law would justify abandonment of the premises as uninhabitable, i.e., a constructive eviction, nevertheless " a tenant cannot claim uninhabitability, and at the same time continue to inhabit." (*Two Rector St. Corp.* v. *Bein* 226 App. Div. 73, 76.)

Were it to be contended that the tenant was deprived of the possession so as to operate a suspension or extinguishment of the rent there would have to be shown an actual eviction, i.e., an act by the landlord derogating materially from the tenant's superior right of possession. " ' There must be an entry and expulsion of the tenant by the landlord, or some deliberate disturbance of the possession depriving the tenant of the beneficial enjoyment of the demised premises, to operate a suspension or extinguishment of the rent.' " (*Edgerton* v. *Page*, 20 N. Y. 281, 285.) (See *Pompey Realty Corp.* v. *Bartha*, 21 N. Y. S. 2d 620.) The record is bare of any such act, or willful aggression by the landlord constituting a hostile entry and exclusion of the tenant.

Yet it seems intolerable that the tenant, trapped between the burned-out shell of his home and the public emergency which prevented him from going to another, must cling to the naked possession of the uninhabitable and while waiting month after month, upon the dilly-dallying of his landlord in the work of repair, still remain liable, without redress from the inexorable accrual of the full rent.

The New York statute and precedents, to which allusion has been made above, were conceived as enlightened relaxations of the much harsher rule of the ancient common law which held the tenant absolutely accountable for rent, in the absence of a covenant to repair by the landlord, even though the building were wholly destroyed. Implicit in these once benign enactments and decisions was the presumption that there was always available other premises to which the tenant could move. The grim realities of the acute housing shortage reduce this time-

worn presumption to sheer naïveté; a postulate exploded by the facts.

It was to free tenants from entrapment between the housing shortage and the imposition of intolerable housing conditions including exaction of unconscionable rents that the Federal statutes, and regulations thereunder, beginning with the Emergency Price Control Act of 1942 (U. S. Code, tit. 50, Appendix, § 901 *et seq.*) and continuing down to the present Housing and Rent Act of 1949 (U. S. Code, tit. 50, Appendix, § 1881 *et seq.*) were put into effect.

The provisions of the 1949 Federal statute and Rent Regulations of the Housing Expediter place squarely on the landlord the direct duty to the tenant to provide along with the possession of the apartment '' the same living space and the same essential services * * * as were provided on the date determining the maximum rent.'' (1949 Federal Controlled Housing Rent Regulation for the New York City Defense-Rental Area, § 825.23.) These essential services, viz., light, heat, water, kitchen, bath and laundry facilities are an inescapable concomitant of the maximum rent. They are so synchronized that any decrease in essential services automatically lowers the amount of rent the landlord is entitled to demand and receive at a maximum. So that immediately on diminution of essential services (as originally established), *ipso facto,* the maximum rent (as originally established) loses its character, as such, and becomes a rent higher than the maximum fixed by law. (Controlled Housing Rent Regulation, § 825.22.) It is for the Federal Housing Expediter to determine the precise amount to which the maximum rent is thereby reduced when there is '' substantial deterioration of the housing accommodations other than ordinary wear and tear since the date or order determining the maximum rent '' or a decrease in the minimum services since such date or order. (Controlled Housing Rent Regulation, § 825.25, par. [c], cl. [2], [3].)

The express prohibition against the landlord's demanding or receiving any rent higher than the maximum (Controlled Housing Rent Regulation, § 825.22) places on the landlord the burden of pleading and proving that the rent demanded in the petition is no greater than that to which the landlord is entitled under the regulations of the Office of Housing Expediter for the New York City Defense-Rental Area. This allegation in landlord's petition, in the view of this court, is conclusively rebutted by the proof.

Concededly the monthly rent of $36 demanded in the petition *was* the maximum rent prior to the substantial deterioration in the housing accommodations wrought by the fire. When, on the next rent day, September 10th, a month after the fire, the landlord had not so much as made even a preliminary move to clear away the heavy fire-debris in tenant's apartment, despite his duty under the rent regulations to provide the same living space as formerly, there was then such a gross, continuing neglect as to impute to the landlord a decrease in the living space to which the tenant was entitled. Thereupon, the maximum rent, the rent he was entitled to demand and receive under the Federal Rent Regulations, lessened in an amount which, though it is not within the powers of this court to fix, nevertheless, made the demand of the landlord for $36 as alleged in the petition, a demand for a rent higher than the maximum rent. Again, by his unseemly delay in making repairs, by his lack of reasonable diligence in restoring light, heat, water, kitchen, bath and laundry facilities throughout September, October, November and December, despite his duty under the rent regulations to maintain these essentials, there is attributable to the landlord such a decrease in required services as to effect a decrease in the maximum rent to a sum less than the $36 a month demanded by the landlord as lawful rent.

Final order for the tenant dismissing the petition on the merits; without prejudice, however, to the landlord's right to recover such rent, for the months in question, as the Housing Expediter may determine to have been the maximum rent, based on the decreased living space and services.

The counterclaim of the tenant is dismissed for failure of proof of assessable damage.