HENRY C. LEMLE *v.* MRS. V. E. BREEDEN.

No. 4772.

NOVEMBER 26, 1969.

RICHARDSON, C.J., MARUMOTO, ABE,
LEVINSON AND KOBAYASHI, JJ.

OPINION OF THE COURT BY LEVINSON, J.

This case of first impression in Hawaii involves the doctrine of implied warranty of habitability and fitness for use of a leased dwelling. The plaintiff-lessee (Lemle) sued to recover the deposit and rent payment totalling $1,190.00. Constructive eviction and breach of an implied

warranty of habitability and fitness for use were alleged as the basis for recovery. The defendant-lessor (Mrs. Breeden) counterclaimed for damages for breach of the rental agreement. The trial court, sitting without a jury, held for the plaintiff and the case comes to us on appeal from that judgment.

The facts in this case are relatively simple and without substantial conflict. The rented premises involved are owned by the defendant, Mrs. Breeden, and are located in the Diamond Head area of Honolulu. The house fronts on the water with the surrounding grounds attractively landscaped with lauhala trees and other shrubbery. The dwelling consists of several structures containing six bedrooms, six baths, a living room, kitchen, dining room, garage, and salt water swimming pool. The main dwelling house is constructed in "Tahitian" style with a corrugated metal roof over which coconut leaves have been woven together to give it a "grass shack" effect. The house is relatively open without screening on windows or doorways.

The defendant herself occupied the premises until sometime between September 14 and September 17, 1964, when she returned to the continental United States, having authorized a local realtor to rent the house for her. On September 21, 1964 during the daylight hours, the realtor showed the home to the plaintiff and his wife, newcomers to Hawaii from New York City, and told them that it was available for immediate occupancy. The plaintiff saw no evidence of rodent infestation during the one-half hour inspection.

That evening the rental agreement was executed. It was for the periods September 22, 1964 to March 20, 1965, and April 17, 1965 to June 12, 1965. The rental was $800.00 per month fully furnished. Mrs. Breeden reserved the right to occupy the premises between March 20 and

April 17, 1965. The plaintiff tendered a check to the defendant's agent for $1,190.00 at that time.

The very next day, September 22, 1964, the plaintiff, his wife and their four children, who had been staying in a Waikiki hotel, took possession of the premises. That evening it became abundantly evident to the plaintiff that there were rats within the main dwelling and on the corrugated iron roof. It was not clear whether the rats came from within the house or from the rocky area next to the water. During that night and for the next two nights the plaintiff and his family were sufficiently apprehensive of the rats that they slept together in the downstairs living room of the main house, thereby vacating their individual bedrooms. Rats were seen and heard during those three nights.

On September 23, 1964, the day after occupancy, the defendant's agent was informed of the rats' presence and she procured extermination services from a local firm. The plaintiff himself also bought traps to supplement the traps and bait set by the exterminators. These attempts to alleviate the rat problem were only partially successful and the succeeding two nights were equally sleepless and uncomfortable for the family.

On September 25, 1964, three days after occupying the dwelling, the plaintiff and his family vacated the premises after notifying the defendant's agent of his intention to do so and demanding the return of the money which he had previously paid. Subsequently this suit was brought.

The trial judge ruled that there was an implied warranty of habitability and fitness in the lease of a dwelling house, that there was a breach of warranty, that the plaintiff was constructively evicted, and that the plaintiff was entitled to recover $1,110.00 plus interest.

We affirm.

## A. THE IMPLIED WARRANTY OF HABITABIL-
ITY AND FITNESS OF LEASED PREMISES.

It is important in a case of this type to separate carefully two very distinct doctrines: (1) that of implied warranty of habitability and fitness for the use intended, and (2) that of constructive eviction. The origin, history, and theoretical justification for these legal doctrines are quite different and are not to be confused.

At common law when land was leased to a tenant, the law of property regarded the lease as equivalent to a sale of the premises for a term. The lessee acquired an estate in land and became both owner and occupier for that term subject to the ancient doctrine of *caveat emptor*. Since rules of property law solidified before the development of mutually dependent covenants in contract law, theoretically once an estate was leased, there were no further unexecuted acts to be performed by the landlord and there could be no failure of consideration. 6 Williston, *Contracts* § 890 (3d ed. 1962). Predictably enough, this concept of the lessee's interest has led to many troublesome rules of law which have endured far beyond their historical justifications. *See* Lesar, *Landlord and Tenant Reform*, 35 N.Y.U. L. Rev. 1279 (1960).

Given the finality of a lease transaction and the legal effect of *caveat emptor* which placed the burden of inspection on the tenant, the actual moment of the conveyance was subject to an untoward amount of legal focus. Only if there were fraud or mistake in the initial transaction would the lessee have a remedy. "[F]raud apart, there is no law against letting a tumble-down house." *Robbins* v. *Jones*, 15 C.B.N.S. 221, 240, 143 Engl. Rep. 768, 776 (1863). In the absence of statute it was generally held that there was no implied warranty of habitability and fitness. 1 American Law of Property

§ 3.45 (Casner ed. 1952) ; 2 R. Powell, The Law of Real Property § 225[2] (Rohan ed. 1967); *Lawler* v. *Capital City Life Insurance,* 68 F.2d 438 (D.C. Cir. 1933).

The rule of *caveat emptor* in lease transactions at one time may have had some basis in social practice as well as in historical doctrine. At common law leases were customarily lengthy documents embodying the full expectations of the parties. There was generally equal knowledge of the condition of the land by both landlord and tenant. The land itself would often yield the rents and the buildings were constructed simply, without modern conveniences like wiring or plumbing. Yet in an urban society where the vast majority of tenants do not reap the rent directly from the land but bargain primarily for the right to enjoy the premises for living purposes, often signing standardized leases as in this case, common law conceptions of a lease and the tenant's liability for rent are no longer viable. As one authority in the field of Landlord-Tenant law has said :

Obviously, the ordinary lease is in part a bilateral contract, and it is so regarded by the civil law. There is no reason why it could not be recognized for what it is, both a conveyance and a contract. But the doctrine that a lease is a conveyance and the rules based thereon were established before the development of the concept of mutual dependency in contracts, and the Anglo-American courts have been slow to apply the doctrine to the contractual provisions of leases. Lesar, *supra* at 1281.

American and English courts have attempted to circumvent this historical rigidity by the use of the doctrine of constructive eviction which serves as a substitute for the dependency of covenants in a large class of cases involving the enjoyment of the premises. Furthermore, limited exceptions to the general rule of no implied war-

ranty of habitability and fitness are also widely recognized. The exception raised in this case applies when a furnished dwelling is rented for a short period of time. *Ingalls* v. *Hobbs,* 156 Mass. 348, 31 N.E. 286 (1892); *Young* v. *Povich,* 121 Me. 141, 116 A. 26, 29 A.L.R. 48 (1922); 1 *American Law of Property* § 3.45 at 268 (Casner ed. 1952). This exception has been justified on the ground that there is no opportunity to inspect, therefore the rule of *caveat emptor* does not apply. Nevertheless, some courts have strictly construed this exception limiting it to only "temporary" rentals, defects existing at the time of rental, and defects in furnishings. *Murray* v. *Albertson,* 50 N.J.L. 167, 13 A. 394 (1888); *Davenport* v. *Squibb,* 320 Mass. 629, 632-33, 70 N.E.2d 793, 795 (1947).

While the inability to inspect is the avowed justification for the exception, it is more soundly supported by the obvious fact that the tenant is implicitly or expressly bargaining for immediate possession of the premises in a suitable condition. The fact that a home or apartment is furnished merely demonstrates the desire for immediate inhabitability as does the brevity of the lease. The exception was plainly a method of keeping the rule of *caveat emptor* from working an injustice in those special circumstances.[1]

Yet it is clear that if the expectations of the tenant were the operative test, the exception would soon swallow up the general rule. "It is fair to presume that no individual would voluntarily choose to live in a dwelling that had become unsafe for human habitation." *Bowles* v. *Mahoney,* 202 F.2d 320, 326 (D.C. Cir. 1952) (Bazelon,

---

[1] The implied warranty of suitability exception has also been extended to situations where the leased premises were not yet built. Here the inability to inspect has real validity. J. D. Young Corp. v. McClintic, 26 S.W.2d 460 (Tex. Civ. App. 1930); Woolford v. Electric Appliances, Inc., 24 Cal. App. 2d 385, 75 P.2d 112 (1938).

J., dissenting). We think that the exception itself is artificial and that it is the general rule of *caveat emptor* which must be re-examined.

In the law of sales of chattels, the trend is markedly in favor of implying warranties of fitness and merchantability. *See* W. Prosser, *Torts* §§ 95, 97 (3d ed. 1964). The reasoning has been (1) that the public interest in safety and consumer protection requires it, and (2) that the burden ought to be shifted to the manufacturer who, by placing the goods on the market, represents their suitability and fitness. Prosser, *supra* § 97. The manufacturer is also the one who knows more about the product and is in a better position to alleviate any problems or bear the brunt of any losses. *See Escola* v. *Coca Cola Bottling Co.,* 24 Cal. 2d 453, 461, 150 P.2d 436, 440 (1944) (Traynor, J., concurring). This reasoning has also been accepted by a growing number of courts in cases involving sales of new homes. *See Carpenter* v. *Donohoe,* 154 Colo. 78, 388 P.2d 399 (1964) ; *Humber* v. *Morton,* 426 S.W.2d 554 (Tex. 1968) (thoroughly reviewing the authorities) ; *Schipper* v. *Levitt & Sons, Inc.,* 44 N.J. 70, 207 A.2d 314 (1965). The same reasoning is equally persuasive in leases of real property.

The Supreme Court of New Jersey recently reexamined the doctrine of *caveat emptor* in a case involving a tenant who vacated leased business premises after being consistently flooded during every rain. In assessing the relative positions of the parties, that court said:

> It has come to be recognized that ordinarily the lessee does not have as much knowledge of the condition of the premises as the lessor. Building code requirements and violations are known or made known to the lessor, not the lessee. He is in a better position to know of latent defects, structural and otherwise, in a building which might go unnoticed by a lessee who rarely has sufficient knowledge or expertise to see or to discover

them. A prospective lessee, such as a small business-man, cannot be expected to know if the plumbing or wiring systems are adequate or conform to local codes. Nor should he be expected to hire experts to advise him. Ordinarily all this information should be considered readily available to the lessor who in turn can inform the prospective lessee. These factors have produced persuasive arguments for re-evaluation of the *caveat emptor* doctrine and, for imposition of an implied warranty that the premises are suitable for the leased purposes and conform to local codes and zoning laws. *Reste Realty Corporation* v. *Cooper,* 53 N.J. 444, 452, 251 A.2d 268, 272 (1969).

The application of an implied warranty of habitability in leases gives recognition to the changes in leasing transactions today. It affirms the fact that a lease is, in essence, a sale as well as a transfer of an estate in land and is, more importantly, a contractual relationship. From that contractual relationship an implied warranty of habitability and fitness for the purposes intended is a just and necessary implication.[2] It is a doctrine which has its counterparts in the law of sales and torts and one which when candidly countenanced is impelled by the nature of the transaction and contemporary housing realities. Legal fictions and artificial exceptions to wooden rules of property law aside, we hold that in the lease of a dwelling house, such as in this case, there is an implied warranty of habitability and fitness for the use intended.

Here the facts demonstrate the uninhabitability and unfitness of the premises for residential purposes. For

---

[2] There has been considerable legal scholarship in this area which supports the implied warranty of habitability and fitness in lease situations. *See* Skillern, *Implied Warranties in Leases: The Need for Change,* 44 Denver L.J. 387 (1967) ; Schoshinski, *Remedies of the Indigent Tenant: Proposal for Change,* 54 Geo. L.J. 519 (1966) ; Lesar, *Landlord and Tenant Reform,* 35 N.Y.U. L. Rev. 1279 (1960) ; Note, *The Indigent Tenant and the Doctrine of Constructive Eviction,* Wash. U. L.Q. 461 (1968).

three sleepless nights the plaintiff and his family literally camped in the living room. They were unable to sleep in the proper quarters or make use of the other facilities in the house due to natural apprehension of the rats which made noise scurrying about on the roof and invaded the house through the unscreened openings.

The defendant makes much of the point that the source of the rats was the beach rocks and surrounding foliage. She contends that this exonerated her from the duty to keep the house free of rats. While it is not clear where the rats came from, assuming that they did originate from outside of the premises, the defendant had it within her power to keep them out by proper and timely screening and extermination procedures. Indeed this was done before the next tenant moved in. But to begin such procedures after the plaintiff had occupied the dwelling and to expect that he have the requisite patience and fortitude in the face of trial and error methods of extermination was too much to ask.

We need not consider the ruling of the trial court that the plaintiff was constructively evicted in light of the decision of this court that there was an implied warranty of habitability in this case. The doctrine of constructive eviction, as an admitted judicial fiction designed to operate as though there were a substantial breach of a material covenant in a bilateral contract, no longer serves its purpose when the more flexible concept of implied warranty of habitability is legally available.

### B. CHOICE OF REMEDIES.

It is a decided advantage of the implied warranty doctrine that there are a number of remedies available. The doctrine of constructive eviction, on the other hand, requires that the tenant abandon the premises within a reasonable time after giving notice that the premises are unin-

habitable or unfit for his purposes. 2 R. Powell, *The Law of Real Property* § 225[3] at 239 (Rohan ed. 1967). This is based on the absurd proposition, contrary to modern urban realities, that "[a] tenant cannot claim uninhabitability, and at the same time continue to inhabit." *Two Rector Street Corp.* v. *Bein,* 226 App. Div. 73, 76, 234 N.Y.S. 409, 412 (1929). Abandonment is always at the risk of establishing sufficient facts to constitute constructive eviction or the tenant will be liable for breach of the rental agreement. Also the tenant is forced to gamble on the time factor as he must abandon within a "reasonable" time or be deemed to have "waived" the defects. 2 Powell, *supra;* Rapacz, *Origin and Evolution of Constructive Eviction in the United States,* 1 De Paul L. Rev. 69, 75-79 (1951).

Some courts have creatively allowed for alternatives to the abandonment requirement by allowing for a declaration of constructive eviction in equity without forcing abandonment. *Charles E. Burt, Inc.* v. *Seven Grand Corporation,* 340 Mass. 124, 163 N.E.2d 4 (1959). Other courts have found *partial* constructive eviction where alternative housing was scarce, thus allowing the tenant to remain in at least part of the premises. *See Barash* v. *Penn. Terminal Real Estate Corp.,* 298 N.Y.S.2d 153 (N.Y. App. Div. 1969); *Johnson* v. *Pemberton,* 97 N.Y.S.2d 153 (N.Y. City Civ. Ct. 1950); *Majen Realty Corp.* v. *Glotzer,* 61 N.Y.S.2d 195 (N.Y. City Civ. Ct. 1946). In spite of such imaginative remedies, it appears to us that to search for gaps and exceptions in a legal doctrine such as constructive eviction which exists only because of the somnolence of the common law and the courts is to perpetuate further judicial fictions when preferable alternatives exist. We do not agree with Blackstone that "[t]he law of real property ... is formed into a fine artificial system, full of unseen connections and nice de-

pendencies, and he that breaks one link of the chain endangers the dissolution of the whole." *Perrin* v. *Blake,* 1 W. Bl. 672, 96 Engl. Rep. 392 (K.B. 1772), *quoted in* W. B. Leach, *Property Law Indicted!* 2 (1967). The law of landlord-tenant relations cannot be so frail as to shatter when confronted with modern urban realities and a frank appraisal of the underlying issues.

By adopting the view that a lease is essentially a contractual relationship with an implied warranty of habitability and fitness, a more consistent and responsive set of remedies are available for a tenant. They are the basic contract remedies of damages, reformation, and rescission. These remedies would give the tenant a wide range of alternatives in seeking to resolve his alleged grievance.

In considering the materiality of an alleged breach, both the seriousness of the claimed defect and the length of time for which it persists are relevant factors. Each case must turn on its own facts. Here there was sufficient evidence for the trier of fact to conclude that the breach was material and that the plaintiff's action in rescinding the rental agreement was justifiable. The plaintiff gave notice of rescission and vacated the premises after the landlord's early attempts to get rid of the rats failed. When the premises were vacated, they were not fit for use as a residence. Nor was there any assurance that the residence would become habitable within a reasonable time. We affirm the judgment for the plaintiff on the ground that there was a material breach of the implied warranty of habitability and fitness for the use intended which justified the plaintiff's rescinding the rental agreement and vacating the premises.

Affirmed.

*W. Patrick O'Connor* (*A. William Barlow* with him on the briefs) for defendant-appellant.

*Robert A. Franklin* for plaintiff-appellee.