Quentin R. MEASE by W. Lawrence Oliver,
Agent, Appellee,

v.

David FOX and Josephine Fox, Appellants.

No. 55027.

Supreme Court of Iowa.

Sept. 19, 1972.

L. Vern Robinson, Des Moines, for appellants.

W. Lawrence Oliver, Des Moines, for appellee.

REYNOLDSON, Justice.

Plaintiff landlord brought this action in Des Moines municipal court to recover three months' rent from defendant tenants, who had vacated the leased home. Defendants' answer denied their default on the rental contract and that plaintiff owned the claim. By later amendments, defendants affirmatively alleged the house when leased was in a state of disrepair and violated the municipal housing code and that plaintiff violated his duty (upon renting the premises for occupancy by human beings) to repair promptly and correct all conditions which rendered the premises unsafe, unsanitary or otherwise untenantable. Defendants further alleged plaintiff was notified of these housing code violations in 1968, in June 1970 one tenant was struck by the falling bathroom ceiling, a city housing inspector then made up a notice of violations, the premises were declared to be a public nuisance, and defendants were ordered to vacate. Defendants prayed plaintiff's petition be dismissed. A counterclaim, containing the same and additional allegations, demanded judgment for $1500 rent paid during the tenancy.

Trial court dismissed the counterclaim because it failed to state any cause of action upon which relief could be granted. The affirmative defense was stricken on the court's initiative, apparently for the same reason and for the additional reason (articulated by the court but not advanced or pled by plaintiff) defendants were estopped from complaining about the disrepair without moving or taking corrective action. Trial court directed defendants to proceed on their original answer and cut off offers of proof relating to the action of the city health department as being on a matter not in issue. Foreclosed from offers of evidence relating to the stricken defense and counterclaim, one of the defendant tenants testified on cross-examination the last rent payment was for May 1970, and defendants resided in the house until August 27, 1970. Trial court thereupon di-

rected a plaintiff's verdict for $225. On defendants' appeal we reverse and remand.

Defendants assert trial court erred in striking the counterclaim and affirmative defense alleging plaintiff breached a contractual obligation warranting the leased premises to be habitable. Plaintiff does not dispute defendants' theory of their pleadings but relies solely on the rule the tenant takes the demised premises as he finds them, and that between lessor and lessee the doctrine of caveat emptor ordinarily applies.

I. At common law the real estate lease took nurture and growth in the field of real property law, not contract law. In property law the lease was regarded as a conveyance of an estate for a term. The contract concept of mutually dependent promises, developing later, had little impact on the landlord-tenant relationship. Leases, elaborately conceived and drafted, were commonly supposed to express the full intent of the parties. Incorporated covenants were held to be mutually independent unless in terms expressly conditional. 6 Williston on Contracts § 890, pp. 580-91 (3d ed. 1962); Lesar, Landlord and Tenant Reform, 35 N.Y.U.L.Rev. 1279 (1960). The rents were considered as issuing from the land, through the tenant as a conduit. 2 F. Pollock & F. Maitland, The History of English Law 131 (2d ed. 1923).

In the agrarian setting of the Middle Ages, with main emphasis on the land conveyance aspect of the lease, there evolved (out of the "waste" doctrine) the concept absolving the landlord of all obligation to repair. 3 W. Holdsworth, A History of English Law 122–23 (6th ed. 1934). That era's simple buildings were of secondary importance and readily repairable by the occupying tenant. The tenant became the owner and occupier for the lease term, and with respect to the condition of the premises, subject to the ancient doctrine of caveat emptor. There was no implied warranty of habitability or fitness for the purpose leased. These rules were generally recognized by common-law jurisdictions, including Iowa. Viterbo v. Friedlander, 120 U.S. 707, 7 S.Ct. 962, 30 L.Ed. 776 (1887); Gamble-Robinson Co. v. Buzzard, 65 F.2d 950 (8 Cir. 1933); Fetters v. City of Des Moines, 260 Iowa 490, 149 N.W.2d 815 (1967); 49 Am.Jur.2d, Landlord and Tenant § 768, pp. 705–06; 52 C.J.S., Landlord and Tenant § 423(3), p. 165. Although deeply embedded, these common-law concepts increasingly lost viability in the era of industrialization with its attendant exploding urban population and housing. The modern city tenant has little interest in the land. He seeks a combination of living space, utilities, facilities, and services suitable for occupation.

Recoiling from the harsh result of the rule's application in an urban setting, courts first evolved exceptions, some conceived in logic, others in fiction. The covenant—frequently implied rather than expressed—of quiet enjoyment with the concomitant remedies based on constructive eviction furnished one escape. Boyer v. Commercial Bldg. Inv. Co., 110 Iowa 491, 81 N.W. 720 (1900); 2 Powell on Real Property § 225(3), pp. 232–40 (Rohan ed. 1971). Iowa, and many other jurisdictions, devised exceptions grounded on partially retained control by landlord of defective common ways and elevators [Stupka v. Scheidel, 244 Iowa 442, 56 N.W.2d 874 (1953)], of common facilities furnished with multiple housing [Primus v. Bellevue Apartments, 241 Iowa 1055, 44 N.W.2d 347 (1950)], and of individual apartments with respect to utilities furnished [Hutchinson v. Des Moines Housing Corporation, 248 Iowa 1121, 84 N.W.2d 10 (1957)].

Still other exceptions were created, imposing warranty of habitability or fitness in the case of furnished houses [Ingalls v. Hobbs, 156 Mass. 348, 31 N.E. 286 (1892); 1 American Law of Property § 3.45, pp. 267–68 (Casner ed. 1952)], premises not yet built [Markman v. Hoefer, 252 Iowa 118, 106 N.W.2d 59 (1960); Swift v. The East Waterloo Hotel Co., 40 Iowa 322 (1875)], and other situations involving

short term leases [Gibson v. Shelby County Fair Ass'n, 241 Iowa 1349, 44 N.W.2d 362 (1950)]. A related rule evolved, imposing on the landlord an obligation to disclose unsafe conditions known to him and not known to or discoverable by the tenant. Wright v. Peterson, 259 Iowa 1239, 146 N.W.2d 617 (1966); 49 Am.Jur.2d, Landlord and Tenant § 767, p. 705; 52 C.J.S., Landlord and Tenant § 417(3), p. 37.

Although such cases blunted the impact of the outmoded doctrine in limited situations, it continued to be attacked by a host of legal writers advancing the reality of an implied warranty of habitability and fitness. Lesar, Landlord and Tenant Reform, 35 N.Y.U.L.Rev. 1279 (1960); Moskovitz, Rent Withholding and the Implied Warranty of Habitability—Some New Breakthroughs, 4 Clearinghouse Rev. 49 (1970); Skillern, Implied Warranties in Leases: The Need for Change, 44 Denver L.J. 387 (1967); Note, Implied Warranty of Habitability in Housing Leases, 21 Drake L.Rev. 300 (1972); Comment, Implied Warranty of Habitability: An Incipient Trend in the Law of Landlord-Tenant? 40 Fordham L.Rev. 123 (1971); Comment, Implied Warranty of Habitability—Demise of the Traditional Doctrine of Caveat Emptor, 20 DePaul L.Rev. 955 (1971); Comment, Implied Warranty of Habitability in Residential Leases—a Defense to Landlord Eviction Actions, 23 U. Fla.L.Rev. 785 (1971); Comment, Plotting the Long-overdue Death of Caveat Emptor in Leased Housing, 6 U.San Fran.L.Rev. 147 (1971); Comment, Tenant Remedies —the Implied Warranty of Fitness and Habitability, 16 Vill.L.Rev. 710 (1971); 20 Buff.L.Rev. 567 (1971); 39 Geo.Wash.L. Rev. 152 (1970).

The trend of modern decisions adopting an implied warranty concept is grounded, in part, on a felt need to re-assess the real as opposed to theoretical meaning of a lease:

"There is a clearly discernible tendency on the part of the courts to cast aside the technicalities in the interpretation of leases and to concentrate their attention, as in the case of other contracts, on the intention of the parties, * * *."

6 Williston on Contracts § 890A, pp. 592–93 (3d ed. 1962).

Discernible also in the current decisions is the tendency to narrow application of the caveat emptor rule. This court has noted and followed this lead in extending the doctrine of implied warranty in the sale of personalty. Drager v. Carlson Hybrid Corn Co., 244 Iowa 78, 56 N.W.2d 18 (1952). We have said the doctrine of caveat emptor is no longer the polestar for business. Syester v. Banta, 257 Iowa 613, 133 N.W.2d 666 (1965).

In 1961 the Wisconsin Supreme Court invoked an implied warranty of habitability to render judgment against a landlord for the tenants' deposit and labor performed on the premises. While the dwelling leased was to be furnished, language in Pines v. Perssion, 14 Wis.2d 590, 596, 111 N.W.2d 409, 412–413 went beyond the furnished dwelling exception:

"To follow the old rule of no implied warranty of habitability in leases would, in our opinion, be inconsistent with the current legislative policy concerning housing standards. The need and social desirability of adequate housing for people in this era of rapid population increases is too important to be rebuffed by that obnoxious legal cliché, *caveat emptor.* Permitting landlords to rent 'tumbledown' houses is at least a contributing cause of such problems as urban blight, juvenile delinquency and high property taxes for conscientious landowners."

In addition to the above policy considerations, subsequent cases recognized landlord's superior position to know of housing law violations and to discover deficiencies in the premises to be leased. The frequent inequality in bargaining power was acknowledged: where housing is in short

supply the potential lessee is in no position to dicker about even the most basic necessities.

Warranties against latent defects, without proof of landlord's knowledge, were implied by the New Jersey Supreme Court in Reste Realty Corporation v. Cooper, 53 N.J. 444, 251 A.2d 268 (1969) and by the Hawaii Supreme Court in Lund v. MacArthur, 51 Haw. 473, 462 P.2d 482 (1969) and Lemle v. Breeden, 51 Haw. 426, 462 P.2d 470 (1969). These and later decisions analyze the trend toward implying warranties of fitness for particular purposes in other law areas. This trend with respect to personal property is evidenced by those warranties implied by Article 2 of the Uniform Commercial Code [Sections 554.2315 et seq. The Code], and has been expanded into the real estate area involving new home sales [see Elderkin v. Gaster, 447 Pa. 118, 288 A.2d 771 (1972); Gable v. Silver, 258 So.2d 11 (Fla.Dist.Ct.App.1972); 11 Williston on Contracts §§ 1399A, 1399B, pp. 529–553 (3d ed. 1968); Bearman, Caveat Emptor in Sale of Realty—Recent Assaults upon the Rule, 14 Vand.L.Rev. 541 (1961); Roberts, The Case of the Unwary Home Buyer: The Housing Merchant Did It, 52 Cornell L.Q. 835 (1967)], and the land on which they are built [Dunham, Vendor's Obligation as to Fitness of Land for a Particular Purpose, 37 Minn.L.Rev. 108 (1953)].

In *Lemle,* the court at 51 Haw. 433, 462 P.2d 474 observed:

"The application of an implied warranty of habitability in leases gives recognition to the changes in leasing transactions today. It affirms the fact that a lease is, in essence, a sale as well as a transfer of an estate in land and is, more importantly, a contractual relationship. From that contractual relationship an implied warranty of habitability and fitness for the purposes intended is a just and necessary implication. It is a doctrine which has its counterparts in the law of sales and torts and one which when candidly coun-

tenanced is impelled by the nature of the transaction and contemporary housing realities. Legal fictions and artificial exceptions to wooden rules of property law aside, we hold that in the lease of a dwelling house, such as in this case, there is an implied warranty of habitability and fitness for the use intended." (Footnote omitted.)

Additional policy considerations were noted in the subsequent landmark case, Javins v. First National Realty Corporation, 138 U.S.App.D.C. 369, 428 F.2d 1071 at 1078–1079 (1970), cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970):

"Today's urban tenants, the vast majority of whom live in multiple dwelling houses, are interested, not in the land, but solely in 'a house suitable for occupation.' Furthermore, today's city dweller usually has a single, specialized skill unrelated to maintenance work; he is unable to make repairs like the 'jack-of-all-trades' farmer who was the common law's model of the lessee. Further, unlike his agrarian predecessor who often remained on one piece of land for his entire life, urban tenants today are more mobile than ever before. A tenant's tenure in a specific apartment will often not be sufficient to justify efforts at repairs. In addition, the increasing complexity of today's dwellings renders them much more difficult to repair than the structures of earlier times. In a multiple dwelling repair may require access to equipment and areas in the control of the landlord. Low and middle income tenants, even if they were interested in making repairs, would be unable to obtain any financing for major repairs since they have no long-term interest in the property. (Footnotes omitted.)

\* \* \* \* \* \*

"Since a lease contract specifies a particular period of time during which the tenant has a right to use his apartment for shelter, he may legitimately expect

that the apartment will be fit for habitation for the time period for which it is rented."

Cases from other jurisdictions which reject the caveat emptor doctrine and hold an implied warranty of habitability applicable in leasing situations include Hinson v. Delis, 26 Cal.App.3d 62, 102 Cal. Rptr. 661 (1972); Jack Spring, Inc. v. Little, 50 Ill.2d 351, 280 N.E.2d 208 (1972); Kline v. Burns, 111 N.H. 87, 276 A.2d 248 (1971); Marini v. Ireland, 56 N.J. 130, 265 A.2d 526 (1970). Support for the change is also found in Gable v. Silver, 258 So.2d 11 (Fla.Dist.Ct.App.1972); Garcia v. Freeland Realty, Inc., 63 Misc.2d 937, 314 N.Y. S.2d 215 (N.Y.City Civ.Ct.1970), and cases cited in the extensive annotation, Modern Status of Rules as to Existence of Implied Warranty of Habitability or Fitness for Use of Leased Premises, 40 A.L.R.3d 646. In none of these cases, nor in the instant case, has there been raised the issue of express warranty based on landlord's rental of a "house," "home" or "apartment." Arguably, such description might well justify tenant's expectation the premises would be reasonably suitable for occupancy. See Marks v. Chapman, 135 Iowa 320, 112 N. W. 817 (1907). On the matter of express warranty by description in sale of goods, see § 554.2313(1)(b), The Code.

We believe the rationale of the above cases justifies departure from the antiquated concept of caveat emptor and impels recognition of an implied warranty of habitability—at least to the extent of freedom from latent defects and material violations of housing code requirements—in either the oral or written lease of a dwelling, including a house, condominium or apartment.

■ Under these circumstances we hold the landlord impliedly warrants at the outset of the lease that there are no latent defects in facilities and utilities vital to the use of the premises for residential purposes and that these essential features shall remain during the entire term in such condition to maintain the habitability of the dwelling. Further, the implied warranty we perceive in the lease situation is a representation there neither is nor shall be during the term a violation of applicable housing law, ordinance or regulation which shall render the premises unsafe, or unsanitary and unfit for living therein. Brown v. Southall Realty Co., 237 A.2d 834 (D.C. App.1968); Marini v. Ireland, 56 N.J. 130, 265 A.2d 526 (1970).

This holding gives overdue recognition to the legislative policy for minimum housing standards expressed in chapter 413, The Code. We are influenced by the language in that enactment, mandating it "shall be held to be the minimum requirements adopted for the protection of health, welfare, and safety of the community." Section 413.9, The Code. That chapter further authorizes cities to enact additional ordinances or regulations with appropriate remedies and penalties. Id. We have held the statute declaring rent uncollectible on a violation of chapter 413 a reasonable exercise of police power and not unconstitutional. Section 413.106, The Code; Burlington & Summit Apartments v. Manolato, 233 Iowa 15, 7 N.W.2d 26 (1942).

■ II. Recognition of an implied warranty of habitability makes available to the tenant the basic contract remedies of damages, reformation and rescission. Lemle v. Breeden, 51 Haw. 426, 462 P.2d 470 (1969); Kline v. Burns, 111 N.H. 87, 276 A.2d 248 (1971). As we have indicated, the breach of warranty must be of such substantial nature as to render the premises unsafe or unsanitary, and thus unfit for habitation. This will usually be a fact question to be determined by the circumstances of each case. Reese v. Diamond Housing Corp., 259 A.2d 112 (D.C.App. 1969).

■ One such circumstance would be whether the alleged defect violated housing laws, regulations or ordinances. Other

factors pertinent in testing the effect and materiality of the alleged breach include:

1. the nature of the deficiency or defect,

2. its effect on safety and sanitation,

3. the length of time for which it persisted,

4. the age of the structure,

5. the amount of the rent,

6. whether tenant voluntarily, knowingly and intelligently waived the defects, or is estopped to raise the question of the breach, and

7. whether the defects or deficiencies resulted from unusual, abnormal or malicious use by the tenant.

See Kline v. Burns, 111 N.H. 87, 276 A.2d 248 (1971); Marini v. Ireland, 56 N.J. 130, 265 A.2d 526 (1970).

■ III. Where there has been a material breach of implied warranty, tenant's damages shall be measured by the difference between the fair rental value of the premises if they had been as warranted and the fair rental value of the premises as they were during occupancy by the tenant in the unsafe or unsanitary condition. See Darnall v. Day, 240 Iowa 665, 37 N.W.2d 277 (1949); Winne v. Kelley, 34 Iowa 339 (1872). When tenant vacates he is then unaffected by the condition of the premises, and that factor loses relevance in the damage equation. For the balance of the term, tenant has lost the benefit of his bargain, assuming he had an advantageous lease. He is therefore entitled to recover at that time for the value of the lease for the unexpired term, that is, the then difference between the fair rental value of the premises if they had been as warranted and the promised rent, computed for that period. 11 Williston on Contracts § 1404, at p. 562 (3d ed. 1968). In all events, tenant should have the incidental and consequential damages which fall within the general principles governing the allowance of such damages. See id.; cf. § 554.2715, The Code.

■ Since the basic contract remedies are available to tenant, the basic contract duties are imposed upon him. The tenant is under an obligation to give landlord notice of a deficiency or defect not known to the latter. This has long been our rule in the case of an express agreement to repair. Woodbury Co. v. Williams Tackaberry Co., 166 Iowa 642, 148 N.W. 639 (1914).

IV. Plaintiff argues a departure from trial court's ruling would "wreck our way of life." We recognize in this opinion another deflection of the thrust of the caveat emptor doctrine. But in so holding, we serve the highest function and duty reserved to this court: to test and weigh our common law against the social and economic demands of current times.

On this subject, the language of the Illinois Supreme Court found in *Jack Spring,* supra, 280 N.E.2d 208 at 217, is pertinent:

"We have considered the arguments of plaintiffs and the Chicago Real Estate Board that any change in the long established rules of landlord and tenant law should be effected by legislative action. Admittedly, the rules for which they contend are the product of judicial decision, and we find particularly apposite the statement of Mr. Justice Cardozo that 'A rule which in its origin was the creation of the courts themselves, and was supposed in the making to express the *mores* of the day, may be abrogated by courts when the *mores* have so changed that perpetuation of the rule would do violence to the social conscience. * * * This is not usurpation. It is not even innovation. It is the reservation for ourselves of the same power of creation that built up the common law through its exercise by the judges of the past.' (The Growth of the Law, chap. IV, p. 136.)"

In this tradition are cases of this court rejecting application of stare decisis to avoid

perpetuating decisional law made obsolete by time. Wardlow v. City of Keokuk, 190 N.W.2d 439 (Iowa 1971); Haynes v. Presbyterian Hospital Ass'n, 241 Iowa 1269, 45 N.W.2d 151 (1950).

V. It follows, of course, this case must be reversed and remanded for new trial on the claim, affirmative defense and counterclaim. Important in the trial will be the question whether the deficiencies and defects alleged by defendants were latent, and whether these and the claimed housing code violations constituted a material breach of implied warranty, rendering the home unsafe or unsanitary and consequently unfit for occupancy. If it is contended defendants waived the defects, or were estopped to claim implied warranty (as indicated by trial court's ruling), those matters should be affirmatively pled in plaintiff's reply. Theobald v. Weber, 259 Iowa 452, 143 N.W.2d 418 (1966); Farmers & Mechanics Sav. Bank of Mpls. v. Campbell, 258 Iowa 1238, 141 N.W.2d 917 (1966).

Reversed and remanded.

All Justices concur.