**Derr v. Cangemi**

*Stephen F. Ritner,* for plaintiffs.

KUBACKI, J., June 21, 1974.—In this case, plaintiff-tenant brought an action against defendant-landlord and her real estate agents. She sued them in assumpsit for the difference between the rent she had paid and the actual rental value of premises in the condition that it was during the entire relationship of landlord and tenant. She also sued for the sum of $86, representing a security deposit she paid to her preceding landlord and which sum was not returned to her by defendant upon the termination of the landlord and tenant relationship between them. She sued for $25, which was the amount she spent to repair the cellar. In addition, she sued (1) in assumpsit for punitive damages based on the willful, wanton and intentional refusal of defendants to make the leased premises habitable and for their reckless indifference to the adverse effect that the condition of the premises had and would have on plaintiff and her family, and (2) in trespass for money damages, for the pain and suffer-

ing caused to her family and herself by the conduct of defendants. Subsequent to the trial, plaintiff withdrew her claim for punitive damages and the trespass claim.

In brief, plaintiff requests that this court rule that in the oral lease involved herein, which contained no express promise on the part of the landlord to repair the premises so as to make it livable, there was an implied warranty of habitability.

Defendants were represented by counsel who withdrew from the case prior to trial. Notice of the date, time and place of trial was given to defendants.

The following appear to be the facts of the case from the pleadings admitted and the testimony at the trial.

Prior to April 26, 1971, plaintiff, with her family, resided at 1321 Porter Street, Philadelphia, Pa. On that date, defendant Cangemi purchased the said premises and remained in title until February 14, 1972. Defendants, Tori, were the agents of defendant. On April 20, 1971, plaintiff complained to the Department of Licenses and Inspections of the City of Philadelphia, concerning violations, in the premises, of the Housing Code of Philadelphia, §7-101. An inspection was made on April 27, 1971, and violations were found. No repairs were made and additional inspections were made in May 1971, on December 13, 1971, on December 15, 1971, and in January 1972. After each inspection, notice of violations were sent to defendant or her defendant-agents.

The defects included window frames being so rotted throughout the premises that panes of glass were loose; windows could not be closed; and openings between each window and the respective sill from one to one and one-half inches; front and vestibule doors that were so rotted that locks could not be attached effectively; doors that blew open permitting rain and

snow to enter the premises; a ceiling in the parlor that had a crack in it the width of the ceiling; that half the plaster was down and ultimately all the plaster fell down; a middle bedroom that had a two-foot hole in the wall; interior walls that were rough, unclean and loose; a toilet that was defective; floor boards were missing; electrical sockets, switches, cover plates and receptacles that were defective or missing; and a drainage system that was in such poor condition as a result of a defective soil pipe, that water and human excrement covered the floor of the basement from the middle of December 1971 to the date plaintiff left the premises. The latter caused a sickening odor to pervade the entire premises all the time and prevented the tenants from the normal enjoyment and use of a home. The tenant repeatedly informed the agents of the landlady of these defects but they did nothing. The Department of Licenses and Inspections and the Water Department of the City of Philadelphia notified defendants many times to repair these violations. Defendants did nothing. Plaintiff removed from the premises and brought this action.

Under the common law, a lease was a conveyance of an interest in land. It absolved the lessor of all obligation to repair. This concept originated in the Middle Ages and, as a result, we have the common law being derived from feudal property law. Under this common law, the landlord did not warrant that the leased premises were in a tenable condition. He was not required to repair unless by express contract. The covenants of a lease were considered to be independent of each other, so that the landlord's breach of this obligation under the lease did not absolve the tenant of his obligation to pay the rent. The common law generally applied the doctrine of caveat emptor to landlord and tenant relationship. The duties and

obligations of the parties were dealt with according to the law of property and not the law of contracts.

Such a rule was, perhaps, well suited to an agrarian society and economy. The land itself was more important than the living structure that was included in the leasehold. The typically versatile tenant-farmer was fully capable of making repairs himself. In fact, the common law, since it assumed that the land was the most important part of the leasehold, required the tenant to pay rent even if any building on the land was destroyed.

However, contemporary urban housing and the contemporary tenant stand in marked contrast to the agrarian model. In an urban society, the vast majority of tenants do not reap the rent directly from the land but bargain primarily for the right to enjoy the premises for living purposes. They seek shelter which includes, not just walls and ceilings, but also servicable plumbing facilities, secure windows and doors, proper sanitation and proper maintenance.

Moreover, the landlord sells housing as a commercial business man and has much greater opportunity, incentive and capacity to inspect and maintain the condition of the building. The tenant must rely on the good faith of the landlord. In dealing with major problems, such as heating, plumbing, electrical or structural defects, the tenant can be likened to the ordinary consumer who cannot be expected to have the knowledge or the capacity or even the opportunity to make adequate inspection of mechanical instrumentalities, like automobiles; and then to decide for himself whether they are fit for the designed purpose. Nor should he be expected to hire experts to advise him.

The low and moderate income tenant is faced with another serious problem. There is an increasingly

severe shortage of low and moderate cost housing in virtually every urban setting. This has left tenants with little bargaining power through which they might gain express warranties of habitability from landlords. Even when defects are apparent, the low income tenant frequently has no realistic alternative but to accept such housing with the expectation that the landlord will make the necessary repairs. This type of tenant is also faced with the inability to produce the money needed to make repairs.

In some jurisdictions, including Pennsylvania, builders of new homes have been held liable to purchasers on the ground that the builder has breached an implied warranty of fitness. See Elderkin v. Gaster, 447 Pa. 118 (1972).

Nine other jurisdictions have already held that there is an implied warranty of habitability in all residential leases. This warranty implies that the landlord has placed the rented premises in a livable conditions prior to the occupancy by the tenant; or that he will do so within a reasonable time after the occupancy of the demised residence; that the facilities will remain usable during the entire term of the lease and that the landlord will maintain the demised premises in a condition which will render the premises livable. This does not require the landlord to insure that the leased premises are in perfect, aesthetically pleasing condition; but it does mean that the bare living requirements must be maintained. Any repairs made necessary by reasonable wear and tear are the responsibility of the landlord. The very least that the landlord should do is to comply with the standards set by the local housing code. These cases hold that the covenant of the tenant to pay rent and the covenant, express or implied, on the part of the landlord to maintain the premises in a habitable condition, are mutually de-

pendent. They have designated that among the remedies available to the tenant are the right to defend an action for possession by the landlord; the right to make repairs and deduct the cost from the rent; the right to recover the security deposit; the right to vacate the premises; and the right to sue the landlord for the difference between the rent paid and the actual rental value of the demised premises in its poor condition.

In Lemle v. Breeden, 51 Hawaii 426, 462 P. 2d 470 (1969), a case of first impression in Hawaii, the Supreme Court of Hawaii affirmed the decision of the lower court and held that the application of an implied warranty of habitability and fitness in leases of dwellings recognizes the changes in the history of leasing transactions, takes into account housing realities, and affirms the fact that a lease is, in essence, a contractual relationship from which the warranty of habitability and fitness is a just and necessary implication. It states further that by adopting this view, a more consistent and responsive set of remedies are available for a tenant. They are the basic remedies of damages, reformation and recission. These remedies would give the tenant a wide range of alternatives in seeking to resolve his alleged grievances.

In Lund v. MacArthur, 51 Hawaii 473, 462 P. 2d 482 (1969), that Supreme Court held that an implied warranty of habitability applies to unfurnished as well as furnished dwellings.

In Marini v. Ireland, 56 N. J. 130 (1970), the lease contained a covenant of quiet enjoyment but did not include a specific covenant to repair. The monthly rental was $95. About three months after the inception of the lease, the tenant discovered that the toilet was cracked and water was leaking into the bathroom. Repeated attempts to inform the landlord were unsuccessful. She repaired the toilet and paid $85.72

therefor. She deducted that sum from the following month's rent and sent the balance together with a receipt for the payment of repairs to the landlord. The landlord demanded the entire rent and, when this was refused, instituted an action for summary dispossession for nonpayment of rent. That Supreme Court reversed the lower court and held that the tenant, under the circumstances, had the right to repair and withhold the repair cost from the rent. That court said on page 144: "Actually it [leasing] is a covenant that at the inception of the lease, there are no latent defects in facilities vital to the use of the premises for residential purposes because of faulty original construction or deterioration from age or normal usage. And further it is a covenant that these facilities will remain in usable condition during the entire term of the lease." The court held that this was a covenant of habitability and livability fitness; and that the implied covenant continued for the duration of the term of the lease.

In Javins v. First National Realty Corporation, 428 F. 2d 1071 (1970), and two other consolidated cases against the same defendant, the United States Court of Appeals for the District of Columbia held that the warranty of habitability measured by the Housing Code is implied by operation of law in all leases, whether oral or written, and for all types of tenancies of urban dwelling units covered by that code. Breach of such warranty gives rise to usual remedies for breach of contract. This warranty cannot be excluded by lease provision. The warranty is of a continuing nature and applies to the condition of the premises at the time of leasing as well as for the duration of the lease.

More apposite to the facts in the matter confronting us are the cases of Berzito v. Gambino, 63 N. J. 460, 308 A. 2d 17 (1973); Hinson v. Delis, 26 Cal. App. 3d

62, 102 Cal. Rep. 661 (1972); and Green v. Superior Court of the City and County of San Francisco, and Jack Sumski, 111 Cal. Rep. 704, 517 P. 2d 1168 (1974).

In the Hinson case, the tenant withheld $200 in rent because the landlord had refused to repair housing code violations. She continued to refuse to pay full rent for the period when the premises had been in an unfit condition. The court of appeal, relying heavily on out-of-State decisions, held that a warranty of habitability was implied by law in the tenant's lease, and that a landlord's breach of such warranty could justify a tenant's refusal to pay the full amount of the rent. The tenant remained liable for the reasonable rental value of the premises, as determined by the trial court, for such time as the premises were in violation of the housing codes.

In the Green case, the landlord, Jack Sumski, sought possession of the premises and $300 in back rent. The tenant admitted nonpayment but defended the action on the ground that the landlord had failed to maintain the leased premises in a habitable condition; that the landlord had violated the housing code and that the tenant had repeatedly complained to the landlord. The court held that a warranty of habitability is implied by law in California; that the breach of such warranty is a defense to a possessory action; that a residential landlord covenants that the premises he leases for living quarters will be maintained in a habitable state for the duration of the lease; and that a tenant's damages shall be measured by the difference between the fair rental value of the premises if they had been as warranted and the fair rental value of the premises as they were during occupancy by the tenant in the unsafe or unsanitary condition. The court also stated that it recognized that the ascertainment of appropriate damages in such cases would often be a difficult

task, not susceptible of precise determination, but, in this respect, these cases do not differ significantly from a host of analogous situations, in both contract and tort law, in which damages cannot be computed with complete certainty.

In Berzito v. Gambino, plaintiff-tenant sought to recover the difference between the rent actually paid and the actual value of the premises which were in a deplorable condition at the time of leasing and which the landlord promised to repair in order to induce the execution of the lease. The appellate court held that the covenant to pay rent and the covenant, whether express or implied on the part of the landlord, to maintain the demised premises in a habitable condition were, for all purposes, mutually dependent. A tenant may initiate an action against a landlord and recover either part or all of the rent paid during the term of the lease if he proves that the lessor has broken his covenant to maintain the premises in a habitable condition. The tenant should be charged only with the reasonable rental value of the property in its imperfect condition during his period of occupancy. The tenant must give the landlord proper notice of the defect and the latter should have a reasonable time to correct it. The court went on to cite cases from the appellate courts of eight other jurisdictions which held that, in any residential lease, not only will there be implied on the part of the landlord a covenant of habitability to extend during the term of the demise, but also this convenant and the covenant to pay rent would be treated as mutually dependent.

Research has failed to reveal any Pennsylvania case which was decided on implied warranty of habitability by a landlord in favor of a tenant. In Reitmeyer v. Sprecher, 431 Pa. 284 (1968), tenants brought an action in trespass against the landlord for physical

harm caused to the tenant by a defective condition of the leased premises which existed when the written lease was executed and which the landlord orally promised the tenant, when the lease was executed, that he would repair. Although the facts in the instant case are not exactly as in the Reitmeyer case, the opinion of the court in that case is relevant to the instant case. On page 289, the court said:

"We must recognize the fact that, since the time when Harris was decided, critical changes have taken place economically and socially. Aware of such changes, we must realize further that most frequently today the average prospective tenant vis-a-vis the prospective landlord occupies a disadvantageous position. Stark necessity very often forces a tenant into occupancy of premises far from desirable and in a defective state of repair. The acute housing shortage mandates that the average prospective tenant accede to the demands of the prospective landlord as to conditions of rental, which, under ordinary conditions with housing available, the average tenant would not and should not accept.

"No longer does the average prospective tenant occupy a free bargaining status and no longer do the average landlord-to-be and tenant-to-be negotiate a lease on an 'arm's length' basis. Premises which, under normal circumstances, would be completely unattractive for rental are now, by necessity, at a premium. If our law is to keep in tune with our times we must recognize the present day inferior position of the average tenant vis-a-vis the landlord when it comes to negotiating a lease.

"In the case at bar, it is alleged that, as an inducement to the execution of the instant lease for premises which were obviously in a defective condition, the landlord promised the tenant to remedy this defective

condition and, in reliance upon that promise a lease was negotiated.

"Under the instant circumstances, a duty on the part of the landlord arose to repair and render safe the defective condition of the premises and if, as alleged, physical harm was caused to the tenant, by a breach of the landlord's promise to repair, liability in tort on the part of the landlord should arise. As we said in Evans v. Otis Elevator Co., 403 Pa. 13, 18, 168 A. 2d 573 (1961): 'It is not the contract per se which creates the duty; it is the law which imposes the duty because of the nature of the undertaking in the contract.' Such holding is based upon the common sense of the situation and in line with the most rudimentary principles of justice."

The case of Elderkin v. Gaster, supra, decided in 1972, is also important for its relevancy to the matter at hand. Elderkin arose out of a dispute concerning an agreement of sale, under the terms of which plaintiffs agreed to purchase from defendant a lot and home to be constructed thereon. The Supreme Court held that there was an implied warranty of habitability in the sale of a new home in a development. It cited, on page 126, cases from ten other jurisdictions which held that "the builder-vendor of a new home impliedly warrants reasonable workmanship and habitability. The warranties appear to apply whether the homes are purchased prior to construction, during construction, or after the dwelling has been constructed but not yet occupied."

The Supreme Court continued and stated:

"Typical of the reasoning of these cases is that of the New Jersey Supreme Court in Schipper v. Levitt & Sons, Inc., 44 N.J. at 91-92, 207 A. 2d at 326: '[T]he contention that caveat emptor should be applied and the deed viewed as embodying all the rights and

responsibilities of the parties disregards the realities of the situation. Caveat emptor developed when the buyer and seller were in an equal bargaining position and they could readily be expected to protect themselves in the deed. Buyers of mass produced development homes are not on an equal footing with the builder-vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale.' Similarly, the Supreme Court of Texas in Humber v. Morton, 426 S.W. 2d at 562 concluded: 'The caveat emptor rule as applied to new houses is an anachronism patently out of harmony with modern home buying practices. It does a disservice not only to the ordinary prudent purchaser but to the industry itself. . . .'

"In Kellogg Bridge Co. v. Hamilton, 110 U.S. 108, 28 L. Ed. 86 (1884), the Supreme Court, speaking through the first Mr. Justice Harlan, stated that the law will imply a warranty of fitness for the purpose intended when a buyer has reason to rely upon and does rely upon the judgment of a seller who manufactures the product. We have concluded that one who purchases a development house conforms to this standard; he justifiably relies on the skill of the developer that the house will be a suitable living unit. Not only does a housing developer hold himself out as having the necessary expertise with which to produce an adequate dwelling, but he has by far the better opportunity to examine the suitability of the home site and to determine what measures should be taken to provide a home fit for habitation. As between the builder-vender and the vendee, the position of the former, even though he exercises reasonable care, dictates that he bear the risk that a home which he has built will be functional and habitable in accordance with contemporary community standards. We thus

hold that the builder-vender impliedly warrants that the home he has built and is selling is constructed in a reasonably workmanlike manner and that it is fit for the purpose intended—habitation."

Considering the views of the out-of-State appellate courts in the landlord and tenant cases and the opinions of our Supreme Court in the Reitmeyer and Elderkin cases, we hold that in the instant matter, there was an implied warranty of habitability. This defendant violated this warranty. Hence, we hold that a monthly rental of $100 for the premises involved was highly excessive in the light of the condition of the premises. Cangemi did not acquire the premises until practically the beginning of May 1971. She should have made the repairs by the end of May 1971. Plaintiff did not pay rent for the months of January and February 1972. Therefore, plaintiff is entitled to a rebate for seven months, from June 1 to December 31, 1971. We find that the premises during those seven months had a rental value of $40 a month; it had no rental value whatsoever during January and February 1972. There was no testimony from plaintiff or admission by defendants as to the escrow rental deposit or the $25 repair payment by plaintiff. Therefore, we can make no award concerning those items.

All the dealings between plaintiff and defendants, Tori, were with Tori as agents of a disclosed principal. Plaintiff had knowledge of the representative capacity of the Toris from the beginning of the lease. Plaintiff alleged this in her complaint and so testified. Therefore, we find in favor of defendant, Jonathan Tori and the Tori Company, and against plaintiff, Minnie Rose Derr.

We find for plaintiff, Minnie Rose Derr, and award her the sum of $420, with interest from December 31, 1971, against defendant, Josephine Cangemi, only.