No. 47,141

SHIRLEY STEELE, and RORY STEELE, RENEE STEELE, ROLLAND STEELE, CARI STEELE, LaVANCE STEELE, Minors, by and through their Mother and next friend, *Appellants*, v. MARVIN E. LATIMER, *Appellee*.

(521 P. 2d 304)

330

*Patrick F. Kelly,* of Render, Kamas & Kelly, of Wichita, and *Stephen J. Blaylock,* also of Wichita, argued the cause, and *R. Michael Jennings,* of Wichita, was with them on the brief for the appellants.

*Brian E. Sullivan,* of Adams, Jones, Robinson and Malone, Chartered, of Wichita, argued the cause, and *Clifford L. Malone,* of the same firm, was with him on the brief for the appellee.

*Vern Miller,* attorney general, *Lance W. Burr* and *William H. Ward,* assistant attorneys general, were on the brief of *amicus curiae.*

The opinion of the court was delivered by

FONTRON, J.: Shirley Steele brings this action on behalf of herself and her six young children against Marvin E. Latimer, their landlord, seeking to recover rent paid, to recover damages and to enjoin violation of the Wichita Housing Code. We shall refer to the parties either as plaintiffs and defendant, or by name.

The trial court, hearing the case without a jury, ruled that Shirley Steele was the only proper party plaintiff; that the defendant had violated the implied covenant of quiet enjoyment in failing to repair a broken water main; and that plaintiff was entitled to $102 damages for breach of that covenant. The court rejected all other relief sought. The plaintiffs have appealed, alleging various errors.

A question of first impression is presented so far as this court is concerned: Is a warranty of habitability to be implied in the rental of urban residential property? The trial court gave a negative answer to this question and herein lies the issue most vigorously pressed and contested in this lawsuit.

As to the facts: When the Steele family outgrew the two bedroom habitation it had been occupying, a search was initiated for larger quarters. The quest for a roomier residence eventually came to an end when an available three bedroom house, owned by Mr. Latimer, was found at 3138 Ethel. After Shirley had seen the house she and her family moved into their new home on the basis of a month to month oral lease at a monthly rental of $105. The date was November 1, 1971.

As of January 1, 1972, the defendant undertook to raise the rent $5 per month and Shirley betook herself to the Wichita Legal Aid Society, where she complained not only of the raise in rent but also of the condition of the premises which she said were inadequately heated and lacked a number of locks. Two letters from the Legal Aid Society to Latimer followed Shirley's visits to the society, as did a trip to the Steele home by a city building inspector who noted various deficiencies in the property.

When no acceptable response was received from Mr. Latimer, the instant action was filed on March 24, 1972. In their petition, the plaintiffs asked for injunctive relief and prayed for monetary judgments as follows: $315 for return of rents paid; $1700 total personal damages, $500 for Shirley and $200 for each of the six children; and $1000 punitive damages. The action was premised on three legal theories: (1) breach of an implied warranty of habitability, (2) negligence in failing to comply with the Wichita Housing Code, and (3) maintaining a nuisance.

Although the trial court entered judgment in favor of the defendant, with the exception of the $102 damages resulting from the broken water line, the court nevertheless found a number of defects and faults in the house: excessive air leakage around the front door and the windows due in part to inadequate repair and in part to the type of windows built into the structure; a counter top next to the sink in bad state of repair presenting an unsanitary condition, hazardous to health; tile on the bathroom floor needing repair and presenting an unsanitary condition; and considerable wear, tear and depreciation. In addition, the trial court found the house did not meet the standards of the Wichita Housing Code then in effect, although its generally dilapidated condition was obvious to Shirley at the inception of and throughout the tenancy.

The trial court also entered the following pertinent conclusions:

"2. That under the settled law of the State of Kansas there is no implied warranty of habitability existing in the landlord-tenant relationship.

"3. That if there was such an implied warranty of habitability that in this case plaintiff would be entitled to recover because the conditions of the house are such that it does violate the principle or theory of implied warranty of habitability."

As tending to support that portion of the trial court's judgment entered in his favor, the defendant relies on and directs our attention to the decision of this court in *Bailey v. Kelly*, 93 Kan. 723,

145 Pac. 556, in which the court quotes from 2 Cooley on Torts, 3d ed., p. 1276:

" 'The mere letting without additional stipulations by the lessor, simply implies that he holds the title and that the lessee shall quietly enjoy the use and occupation during his tenancy; and not that the premises are or shall be in any particular condition or state of repair, or that they are suitable for the purpose for which they were let.' " (pp. 729, 730.)

Continuing its opinion in that case, the court said that a landlord owes no duty to a prospective tenant except not to entrap him by concealing facts which an ordinary inspection would not disclose, even though the buildings might otherwise be in a tumble-down, uninhabitable or unsafe condition for use. From a factual standpoint the *Bailey* case is so dissimilar from the instant action that we view it as being readily distinguishable and as having little if any precedential value under the instant circumstances.

It has been said that the development of the common law has been determined largely by the social needs of the society it was designed to serve, and that the capacity for growth and change is one of its most significant features. *(Linkins v. Protestant Episcopal Cathedral Found.,* 187 F. 2d 357, 28 A. L. R. 2d 521; *Lembke v. Unke,* 171 N. W. 2d 837 [N. Dak.]; 15 Am. Jur. 2d, Common Law, § 2, pp. 795, 796.) The most casual student of ages past would agree that the principle of change runs deeply through human history and like a golden thread weaves new "people requirements" into the fabrics of altered social patterns.

Even though the common law of England has provided the basics of the law in this state since territorial days *(Hoffman v. Dautel,* 192 Kan. 406, 414, 388 P. 2d 615), it is clear, by legislative pronouncement, that it may be modified "by constitutional and statutory law, judicial decisons, and the *conditions and wants of the people."* (Emphasis supplied.) (K. S. A. 77-109.)

This court has never been disposed, as was announced in *Wright v. Jenks,* 124 Kan. 604, 609, 261 Pac. 840, "to resuscitate [the] obsolete subtlety of the common law." To the contrary, where a common law principle has been found unsuited to the conditions and wants of the people of this commonwealth, its application has been rejected. *(Isley Lumber Co. v. Kitch,* 123 Kan. 441, 445, 256 Pac. 133.) We find our viewpoint adequately expressed in 15 Am. Jur. 2d, supra, p. 797:

"The nature of the common law requires that each time a rule of law is applied, it be carefully scrutinized to make sure that the conditions and needs

of the times has not so changed as to make further application of it the instrument of injustice. Whenever an old rule is found unsuited to present conditions or unsound, it should be set aside and a rule declared which is in harmony with those conditions and meets the demands of justice."

In recent years there has been a noticeable trend among courts in this country to recognize an implied warranty on the part of the lessor of urban residential property that the premises leased by him are suitable for human habitation and will be maintained in suitable condition throughout the duration of the tenancy. Among the growing number of authorities adhering to this view are *Lemle v. Breeden,* 51 Haw. 426, 462 P. 2d 470; *Jack Spring, Inc. v. Little,* 50 Ill. 2d 351, 280 N. E. 2d 208; *Javins v. First National Realty Corporation,* 428 F. 2d 1071; *Foisy v. Wyman,* 83 Wash. 2d 22, 515 P. 2d 160; *Berzito v. Gambino,* 63 N. J. 460, 308 A. 2d 17; and *Hinson v. Delis,* 26 Cal. App. 3d 62, 102 Cal. Rptr. 661.

Usages, customs and patterns in housing practices have undergone dramatic change since the common law rules respecting landlord-tenant relationships were developing in feudal England. Dwelling habits fashioned under the agrarian atmosphere of those far-off times are hardly suitable for congested urban settings. Under the tenurial system a lease was primarily considered to be the conveyance or transfer of an interest in realty. The value to the tenant lay mainly in the land itself, the buildings being considered for the most part as incidental to the lease. Dwellings were ordinarily of simple construction, without today's modern conveniences and mechanical gadgets, and could easily be kept in repair by the tenant himself. (*Marini v. Ireland,* 56 N. J. 130, 265 A. 2d 526; *Kline v. Burns,* 111 N. H. 87, 276 A. 2d 248.)

The feudal concept that a lease is simply the sale or conveyance of an interest in land (*Javins v. First National Realty Corporation,* supra; *Lemle v. Breeden,* supra.) has given way to the more realistic view that a lease is essentially a contract. In *Dutton v. Dutton,* 122 Kan. 640, 253 Pac. 553, this court has said:

"Landlord and tenant is a phrase used to denote the familiar legal relation existing between the lessor and lessee of real estate. The relation is contractual and is constituted by a lease or agreement therefor of lands for terms of years, from year to year, for life or at will. . . ." (pp. 641, 642.)

The relationship of landlord and tenant being contractual in character, it follows that mutually dependent rights and obligations arise therefrom, binding alike on lessor and lessee. (*Lemle v.*

*Breeden,* supra.) The mutuality of the contractual relationship is pointed up in *Foisy v. Wyman,* supra, where the Supreme Court of that state said:

". . . Any realistic analysis of the lessor-lessee or landlord-tenant situation leads to the conclusion that the tenant's promise to pay rent is in exchange for the landlord's promise to provide a livable dwelling." (p. ____.)

The economic realities of today, in contrast to those which prevailed in the less complex baronial area of the middle ages, are reflected in the often quoted language of Judge J. Skelly Wright, speaking in *Javins v. First National Realty Corporation,* supra:

". . . Today's urban tenants, the vast majority of whom live in multiple dwelling houses, are interested, not in the land, but solely in 'a house suitable for occupation.' Furthermore, today's city dweller usually has a single, specialized skill unrelated to maintenance work; he is unable to make repairs like the 'jack-of-all-trades' farmer who was the common law's model of the lessee. Further, unlike his agrarian predecessor who often remained on one piece of land for his entire life, urban tenants today are more mobile than ever before. A tenant's tenure in a specific apartment will often not be sufficient to justify efforts at repairs. In addition, the increasing complexity of today's dwellings renders them much more difficult to repair than the structures of earlier times. In a multiple dwelling repair may require access to equipment and areas in the control of the landlord. Low and middle income tenants, even if they were interested in making repairs, would be unable to obtain any financing for major repairs since they have no long-term interest in the property. (pp. 1078, 1079.)

Earlier in the same opinion Judge Wright pointed out:

". . . When American city dwellers, both rich and poor, seek 'shelter' today, they seek a well known package of goods and services—a package which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance." (p. 1074.)

In discussing the housing problems with which today's urban populations are confronted, the Wisconsin Supreme Court in *Pines v. Perssion,* 14 Wis. 2d 590, 596, 111 N. W. 2d 409, 412, phrased the situation this way:

". . . To follow the old rule of no implied warranty of habitability in leases would, in our opinion, be inconsistent with the current legislative policy concerning housing standards. The need and social desirability of adequate housing for people in this era of rapid population increases is too important to be rebuffed by that obnoxious legal cliché, *caveat emptor.* Permitting landlords to rent 'tumble-down' houses is at least a contributing cause of such problems as urban blight, juvenile delinquency, and high property taxes for conscientious landowners."

Building codes are common today in many urban centers throughout the United States and the modern weight of authority in this country appears to be that the minimum standards embraced within a housing ordinance, building code or other municipal regulation are to be read into and will be implied by operation of law in housing contracts. (*Kline v. Burns*, supra; *Pines v. Perssion*, supra; *Javins v. First National Realty Corporation*, supra; *Boston Housing Authority v. Hemingway*, _____ Mass. _____, 293 N. E. 2d 831.) The rule is stated in *Mease v. Fox*, 200 N. W. 2d 791 (Iowa), where the court, after relating the circumstances of the case and after discussing legal authorities rejecting the doctrine of *caveat emptor* as applied to rental of urban properties, went on to say:

"Under these circumstances we hold the landlord impliedly warrants at the outset of the lease that there are no latent defects in facilities and utilities vital to the use of the premises for residential purposes and that these essential features shall remain during the entire term in such condition to maintain the habitability of the dwelling. Further, the implied warranty we perceive in the lease situation is a representation there neither is nor shall be during the term a violation of applicable housing law, ordinance or regulation which shall render the premises unsafe, or unsanitary and unfit for living therein. Brown v. Southall Realty Co., 237 A. 2d 834 (D. C. App. 1968); Marini v. Ireland, 56 N. J. 130, 265 A. 2d 526 (1970)." (p. 796.)

In similar vein the Illinois Supreme Court spoke in *Jack Spring, Inc. v. Little*, supra:

"We find the reasoning in *Javins* persuasive and we hold that included in the contracts, both oral and written, governing the tenancies of the defendants in the multiple unit dwellings occupied by them, is an implied warranty of habitability which is fulfilled by substantial compliance with the pertinent provisions of the Chicago building code. . . ." (p. 366.)

As indicated earlier in this opinion the Wichita Housing Code, duly adopted by Ordinance No. 27-902, was in full force and effect at all times material to this action. The Code is broad and comprehensive in its outreach; it sets basic standards to be met by city housing and requires lessors and lessees to meet the same as provided therein; it provides for inspections, notices of violations and procedures for conducting hearings and appeals; and it provides criminal penalties for violating the act. The trial court found that the house at 3138 Ethel did not meet the standards set by the Wichita Housing Code in that (1) the windows and front door were not reasonably tight; (2) that there was excess air leakage; and (3) the cabinet top and bathroom floors were unsanitary and dangerous to health.

Under familiar legal principles the provisions of the city's housing code relating to minimum housing standards were by implication read into and became a part of the rental agreement between Shirley Steele and Marvin E. Latimer. The pertinent rule of law is summarized in 17 Am. Jur. 2d, Contracts, § 257, pp. 654-656:

"It is a general rule that contracting parties are presumed to contract in reference to the existing law; indeed, they are presumed to have in mind all the existing laws relating to the contract, or to the subject matter thereof. Thus, it is commonly said that all existing applicable or relevant and valid statutes, ordinances, regulations, and settled law of the land at the time a contract is made become a part of it and must be read into it just as if an express provision to that effect were inserted therein, except where the contract discloses a contrary intention. . . ."

See, also, *Edwards v. United States*, 215 F. Supp. 382 (D. C. Kansas); *Rankin v. Ware*, 88 Kan. 23, 127 Pac. 531; Anno. 110 A. L. R., Contract—Municipal Ordinance as Element, pp. 1048, *et seq.*

Where a breach of an implied warranty of habitability has occurred traditional remedies for breach of contract are available to the tenant, including the recovery of damages. In *King v. Moorehead*, 495 S. W. 2d 65 (Mo. App.) the court sets forth the governing rule:

". . . Under contract principles a tenant's obligation to pay rent is dependent upon the landlord's performance of his obligation to provide a habitable dwelling during the tenancy. . . . A more responsive set of remedies are thus made available to the tenant, the basic remedies for contract law, including damages, reformation and rescission. . . ." (pp. 75, 76.)

On the question of damages, see, also, *Mease v. Fox*, supra; *Kline v. Burns*, supra; *Lemle v. Breeden*, supra.

The judgment entered in this case by the trial court is affirmed insofar as the recovery of $102 for breach of implied warranty of quiet enjoyment is concerned, but the judgment is otherwise reversed, and the cause is remanded for trial on the issue of damages sustained by the plaintiffs which have proximately resulted from the defendant's breach of implied warranty in failing to maintain the premises in compliance with the standards set by the Wichita Housing Code.

It is so ordered.

SCHROEDER, J., dissenting.

FROMME, J., concurring. With reluctance I join my brothers on this court in what may be called the birth of the implied warranty of habitability in Kansas. However I feel the court in its opinion

should have provided more guidelines for the future growth of the newborn law. It should be pointed out as a corollary to Syl. ¶ 9 that not only are the usual remedies for breach of contract available to the lessee in cases of breach but also the usual defenses may be employed by the lessor in such suits.

It would have been helpful, I feel, for the court in its present opinion to have discussed several troublesome areas which will arise from the grave in which the doctrine of *caveat emptor* was buried. These areas were mentioned by the Iowa court in *Mease v. Fox*, 200 N. W. 2d 791 (Iowa), where it was said:

". . . Important in the trial will be the question whether the deficiencies and defects alleged by defendants [lessees] were latent, and whether these and the claimed housing code violations constituted a material breach of implied warranty, rendering the home unsafe or unsanitary and consequently unfit for occupancy. If it is contended defendants waived the defects or were estopped to claim implied warranty (as indicated by trial court's ruling), those matters should be affirmatively pled in plaintiff's [lessor's] reply. [Citations omitted.]" (p. 798.)

This court should have given immediate consideration to some guideline for the future in determining the extent of the implied warranty of habitability. What are the nature of the defects which should be considered a material breach of the warranty? In the present opinion the court holds that failure to maintain the premises in compliance with standards set by the Wichita Housing Code constitutes a breach of the implied warranty of habitability. The specific defects noted, such as air leakage, broken counter top in the kitchen and loss of tile in the bathroom, do not indicate how substantial such defects must be to constitute a material breach.

To constitute a breach of the implied warranty of habitability the lessee should be required to bring the defects to the attention of the lessor and give him a reasonable time to remedy them. (*Berzito v. Gambino*, 63 N. J. 460, 308 A. 2d 17.) The defects should be of such a nature as renders the living quarters unsafe, unsanitary or uninhabitable. Where there has been a material breach of implied warranty of habitability with respect to residential property, tenant's damages should be measured by the difference between the fair rental value of the premises if they had been as warranted and the fair rental value of the premises as they were during occupancy by the tenant in the unsafe or unsanitary condition. When a tenant vacates the premises because of the landlord's breach

the condition of the premises should lose its relevance after the vacation for the damages should be determined on the basis of the fair rental value during the tenant's occupancy.

Not every defect or inconvenience should be deemed to constitute a breach of covenant of habitability; the condition complained of should be such as truly renders the premises uninhabitable in the eyes of a reasonable person. The following factors have been considered material by other courts in determining whether there has been a material breach of the implied warranty of habitability:

1.  the nature of the deficiency or defect,
2.  its effect on safety and sanitation,
3.  the length of time for which it persisted,
4.  the age of the structure,
5.  the amount of the rent,
6.  whether tenant voluntarily, knowingly and intelligently waived the defects, or is estopped to raise the question of the breach,
7.  whether the defects or deficiencies resulted from unusual, abnormal or malicious use by the tenant, and
8.  whether the alleged defect would be such as to violate housing laws, regulations or ordinances.

(See *Mease v. Fox,* supra; *Kline v. Burns,* 111 N. H. 87, 276 A. 2d 248; *Marini v. Ireland,* 56 N. J. 130, 265 A. 2d 526.)

The court's opinion does not speak directly to many of these questions and I realize to do so might be considered *dicta,* however, some guidelines for the future should be given. Therefore, I join the opinion of the court concurring.