Sharon HENDERSON et al., Appellants,

v.

W. C. HAAS REALTY MANAGEMENT, INC., et al., Respondents.

No. KCD 28008.

Missouri Court of Appeals, Kansas City District.

Dec. 5, 1977.

Motion for Rehearing and/or Transfer Denied Jan. 30, 1978.

Application to Transfer Denied March 13, 1978.

Lloyd S. Hellman, Kansas City, for appellants; Achtenberg, Sandler, Balkin & Hellman, Kansas City, of counsel.

Glenn E. McCann and Stephen D. Manz, and John H. Foard, Kansas City, for respondents; Knipmeyer, McCann, Fish & Smith, and Foard & Foard, Kansas City, of counsel.

Before PRITCHARD, P. J., SWOFFORD, C. J., and DIXON, J.

PRITCHARD, Presiding Judge.

Upon their submission to the jury by Instruction No. 2 of their theory of breach of an implied warranty of habitability, appellants recovered separate verdicts for fire losses against respondents as follows: Millie Shaffer, personal injuries, $2,000.00, property damage, $6,916.00; Sharon (Henderson) Parr, property damage, $13,200.00; and Billie and Virginia Putnam, property damage, $10,000.00. Appellants were tenants in the Monticello Manor Apartments, 8335–8337 Lowell, Overland Park, Kansas, owned by individual respondents, William C. Haas, William S. Halverhaut, and Irene D. Ellege, and which was managed by respondent, W. C. Haas Realty Management, Inc. The 20-unit apartment was destroyed by fire on October 10, 1971.

The trial court sustained respondents' after-trial motion for judgment notwithstanding the verdicts, and entered judgment for respondents in accordance with their motion for directed verdict made at the close of all the evidence. As relevant to the submission of Instruction No. 2, paragraph 3 of the motion is: "Plaintiffs' evidence fails to make a submissible case against defendants on the grounds that defendants are liable for breach of implied warranty and that such breach caused plaintiffs' damages."

The 8335–8337 Lowell building faced west, and there was a fire wall separating the 10 units on the north (8335) from the 10 units on the south (8337), which was the portion south of the fire wall, where all appellants lived. The buildings were all electric for heating, cooling and cooking facilities. 8337 had 4 apartment units on the ground level, one in each quadrant; 4 apartment units on the second floor; and 2 basement apartment units which had windows on the east or back side of the building. To the west of the two basement apartments were common areas for storage, coin operated washing machines, fuse boxes and walkways.

William Brown, of Control Service Company, was called on an emergency basis on Saturday night, October 9, 1971, because there was no heat in the 8335–8337 building. Working from 5:00 p. m. until 9:00 to 10:00 p. m. that night, he replaced a 200 amp fuse in the boiler, locating no problem, and the heating unit was cycled through 4 to 5 functions, taking only 4 to 5 minutes per cycle. The system was switched from cooling to heating at that time.

Millie Shaffer was the first to discover the fire shortly before 5:00 a. m., October 10, 1971, when she heard a sound like chains rattling at her front door. She lived in the basement apartment, northeast quadrant, adjacent to the fire wall. When she got out of bed and reached her living room, Millie found it full of smoke and heard "snapping, popping, cracking and roaring" overhead. She aroused her children and went to the door of her apartment leading to an inner hallway, but was driven back by black

smoke which billowed into her apartment. She saw no flame at all. Two of her children had made it to the outside, and Millie and another child escaped through a back basement window to a parking lot. Millie left the area to deposit her children with a friend, and returned at 6:00 a. m. She later saw the front, west quadrant, of the building collapse, which was over the laundry and storage area.

Audrey Nelson lived on the first floor northwest, just over the washing machine and storage areas of the basement. She was awakened by a clanging sound in the floor. She got out of bed and felt heat in the floor. The inner hallway from her apartment door was filled with rolling smoke as was her living room. She saw no flames. Water pipes from overhead in the kitchen had burst and hot water was coming from overhead. She opened her apartment front door again, but was met with intense heat which burned her eyebrows, face and hair. With the aid of a hammer, she opened her front window and screen and escaped.

The Putnams, occupying the first floor apartment southeast, were awakened by the rattling and banging of pipes. Mr. Putnam opened the door to their apartment and saw the hallway full of smoke. He closed the door and the two escaped through their balcony, then dropping down to the sloping driveway to the parking lot. Mr. Putnam saw flames at 9:30 a. m. which were then in the basement of the laundry area.

Overland Park Fire Chief, James Broockerd, arrived at the scene at 5:00 a. m., and saw that the front whole hallway, about 8 feet wide, which ran from the front to the rear of the building "was involved in, the flame was just rolling in there and . . ." This meant that the flames were generating a lot of heat, but the flames were knocked down with two 1½ inch hoses in less than 30 seconds. Later, Chief Broockerd opened the basement door and then knew where the fire was because he could hear it popping and cracking to his right, or northwest, which was the washing machine

and storage area. The firefighters reported that the fire was above them in the basement lapping or seeping out of the sheetrock here and there. From the color of the smoke, Chief Broockerd testified that it was a wood and insulation fire, and he determined that the fire was running through the floors and up through the walls, but it was not visible for over two hours, as confirmed by the resultant collapse of the building. After two hours, the floor of the first floor apartment northwest, above the laundry and storage area, first fell in, and then the first floor southwest fell in. From all the facts, Chief Broockerd determined that the fire had been in the basement inter-ceiling area in the northwest corner (8337) above the storage and laundry common area. He testified further: "Q Chief, now, of the electric wires, the water pipes and vent pipes that run through the floors and up the walls, which one of those systems is capable of starting fires? A Well, just the electric ones. Q Now, if this is an all electric building, with electric water heaters in each one with wires running through the walls and to each and every apartment, does that have a tendency to increase the amount of wires in that building? A Yes, sir, it would."

The Fire Captain's report contained this statement: "The cause is unknown, but the fire started in the basement ceiling and spread through the floors and into the walls and the attic, there was no visible fire in any part of the building until it started collapsing." A report concerning unburned items in the basement stated that no (storage) locker showed burning from doors down to the floor, and that a metal trash container contained an unburned Snowy Bleach box and dryer lint.

The heating system in the building was a chilled or heated water system running throughout the building, with an electric blower in each apartment. There was an outside compressor and thermometer which regulated the use of hot or cold water. Air conditioning problems had existed in the summer on four occasions up to September 1 when the compressor controls were jumpered to go around a defective compressor.

■ Without doubt an implied warranty of habitability of leased premises exists in present day law as to the relation between landlords and tenants. See *Steele v. Latimer*, 214 Kan. 329, 521 P.2d 304 (1974); *King v. Moorehead*, 495 S.W.2d 65 (Mo.App.1973); and importantly, the extensive analysis in *Old Town Development Company v. Langford*, 349 N.E.2d 744 (Ind.App.1976) [wherein the petition for transfer to the Indiana Supreme Court was dismissed by stipulation on September 26, 1977].

The determinative issue here is, however, whether appellants made a submissible case of a *breach* of an implied warranty of habitability of the apartments where they resided prior to the fire of October 10, 1971. The first facet of this issue is whether appellants proved the cause of the fire from a defective condition (wiring) in the common areas of the apartment complex. The second facet is whether respondents (landlords and manager corporation) had, or were required to have, constructive notice or knowledge of any defect in the premises (wiring) under the theory of implied warranty of habitability of the leased premises.

As to the first facet, appellants urge a theory akin to the doctrine of res ipsa loquitur cases, applicable in proved circumstances under the leading case of *McCloskey v. Koplar*, 329 Mo. 527, 46 S.W.2d 557, 559[1] (Mo.banc 1932), and the many cases following it, to create an inference of negligence. Appellants say, in effect, that the same consideration of circumstances creates an inference as to the existence of a defect, and hence an inference of a breach of an implied warranty of habitability of the premises in question. It is unnecessary here to treat an extension of the res ipsa doctrine to warranty cases. In Frumer and Friedman, Products Liability, § 16.-03[4][b][i], it is said, "We discussed in § 11.01 *supra* the drawing of reasonable inferences in connection with causation in fact in negligence cases, pointing out that negligence and causation in fact are sometimes confused by the courts. Obviously, the same reasonable inferences as to causation in fact may be drawn in warranty cases, as are drawn in negligence cases.

The courts have said that the doctrine of res ipsa loquitur relates to cases involving negligence and has no application to an alleged breach of warranty. But, as discussed in § 16.01[1] *supra* proof of negligence is unnecessary in a warranty action, so that when the courts talk about res ipsa being inapplicable in a warranty action and hold against plaintiff, it would seem that they are actually saying that causation in fact could not reasonably be inferred from the evidence." See also Hursh & Bailey, American Law of Products Liability 2d, § 3:80, p. 618, and the there cited case of *State Farm Mut. Auto. Ins. Co. v. Anderson-Weber, Inc.*, 252 Iowa 1289, 110 N.W.2d 449, 452[3] (1961), holding that although the doctrine of res ipsa loquitur, frequently resorted to in negligence cases, is not applicable as such to the field of warranty, the usual resort to circumstantial evidence in attempting to establish a breach of warranty indicates some of the same thinking found in res ipsa loquitur cases.

Frumer and Friedman, Products Liability, § 12.03[9][d], p. 358, 360, states, "The presence of the defect itself may be inferable, just as negligence may be inferable, from circumstantial evidence." In 35 Am. Jur.2d, Fires, § 56, p. 640, it is stated, "However, it is not required that the evidence exclude all possibility of another origin or that it be undisputed; it is sufficient if all the facts and circumstances in evidence fairly warrant the conclusion that the fire did not originate from some other cause. Thus, the origin of a fire has generally been held sufficiently established by inferences drawn from circumstantial evidence." See *Reconstruction Finance Corp. v. Peterson Bros.*, 160 F.2d 124 (C.A.5th 1947); *Texas & P. Ry. Co. v. Brandon*, 183 S.W.2d 212, 214[2] (Tex.Civ.App.1944); *Behrens v. Gottula*, 160 Neb. 103, 69 N.W.2d 384, 388[5] (1955); *New York, C. & St. L. R. Co. v. Roper*, 176 Ind. 497, 96 N.E. 468, 470[7] (1911); and *Gichner v. Antonio Troiano Tile & Marble Co.*, 133 U.S.App.D.C. 250, 410 F.2d 238 (1969), where the court cited and quoted from *George v. Bekins Van & Storage Co.*, 33 Cal.2d 834, 835, 205

P.2d 1037, 1044 (1949) "'* * * In this case the experts set forth in detail the facts and reasons on which they based their opinions. Their conclusion that the fire was caused by careless smoking was reached by a process of elimination of other possible causes. * * *.'" See also *Gechijian v. Richmond Ins. Co.*, 305 Mass. 132, 142, 25 N.E.2d 191, 197 (1940), cited at page 247 of the *Gichner* opinion; and importantly, *Citizens Bank of Festus v. Missouri Natural Gas Co.*, 314 S.W.2d 709, 715[4] (Mo.1958), where plaintiff objected to testimony of an expert witness as to a cause of the fire for which defendant would not have been liable, on grounds that there was no evidence of any electrical fire starting and there was no evidence of leaking of oil or water to break down electrical insulation. The court said, "In *Kimmie v. Terminal R. R. Ass'n of St. Louis*, 334 Mo. 596, 66 S.W.2d 561, 565, we said: 'We do not hold, however, as defendant contends, that it is improper to ask an expert witness if something might, could, or would produce a certain result. An expert's view of possibility or probability is often helpful and proper.' * * * Defendant had some circumstantial evidence of an electrical fire. There was evidence of electric wires under the floor in the burned floor areas, also of nearby water pipes and dental chairs operated by hydraulic oil."

∎ Taking the circumstantial evidence adduced by appellants as to the place where the fire began in its light most favorable to them, these facts would support the jury's finding that it did so in the common storage and washing machine area in the northwest quadrant of the basement. When awakened from her northeast quadrant of the basement apartment, Millie Shaffer heard "snapping, popping, crackling and roaring" overhead. She later saw the front, west quadrant over the laundry and storage area, collapse. Audrey Nelson was awakened by a clanging sound in the floor, just over the laundry and storage area. She felt heat in the floor when she got out of bed. Chief Broockerd opened the basement door and knew where the fire was because he could hear it popping and cracking to his

right or northwest, and the firefighters reported that the fire was above them in the basement lapping or seeping out of the sheetrock here and there. The Chief determined that the fire was running through the floors and up through the walls. The floor over the storage and laundry area first fell in after two hours. From all the facts, the Chief determined that the fire had been in the basement inter-ceiling area in the northwest corner above the storage and laundry common area. Of all the things which ran through the floors and walls, the only thing which was capable of starting a fire was the electrical wiring. This opinion of Chief Broockerd is within the ambit of expert testimony approved in the *Citizens Bank* case, supra. Note also the *Old Town* case, supra, loc. cit. 349 N.E.2d 750, where it was said, "[T]he experts were in agreement 'that the only thing in the area that was likely to cause the fire would have been from the furnace or the components of the furnace', i. e., the flue vent.", and note also that Chief Broockerd's opinion tended to eliminate any other cause of the fire than electrical wiring under the *Bekins Van & Storage* case, supra. From all the circumstantial evidence the jury had a sufficient basis to apply a logical inference that the fire started in the ceiling of the common area of the basement, and that its cause was some defect in the extensive electrical wiring in that area. *Esmar v. Zurich Insurance Company*, 485 S.W.2d 417, 421[3] (Mo.1972). This is true even though Chief Broockerd was unable to reach a conclusion as to the cause of the fire from an examination of the wiring, it having been destroyed by the fire, or that Fire Inspector Dinneen stated in his report, "This fire was burning either on the underside of the first floor or on top of material in storage lockers and communicated to hollow wall spaces through pipe chases, * * *." Any conflicts in the evidence on the subject were for the jury to determine. *Pfefer v. Bachman*, 386 S.W.2d 680, 683[3, 4] (Mo.App.1965).

∎ Without doubt, the state of Kansas (*Steele v. Latimer*, supra, loc. cit. 521 P.2d

309) has adopted the doctrine of implied warranty of habitability which arises by virtue of the lease contract between landlord and tenant from *Mease v. Fox*, 200 N.W.2d 791, 796 (Iowa 1972), " 'Under these circumstances we hold the landlord impliedly warrants at the outset of the lease that there are no latent defects in the facilities and utilities vital to the use of the premises for residential purposes and that these essential features shall remain during the entire term in such condition to maintain the habitability of the building. * * * ." In *Old Town*, supra, loc. cit. 349 N.E.2d 774, the doctrine is stated, "By renting an apartment for residential use the landlord impliedly (1) *warrants* that the leasehold is then free from any latent defects or conditions rendering the premises uninhabitable for residential purposes; and (2) *promises* that the premises will remain reasonably fit for residential purposes during the entire term, a promise which necessarily carries with it an implied duty to repair."

The defect in the wiring of this apartment complex, which the jury as above held could infer existed and which caused the fire, was obviously latent, the area of wiring being concealed in the sheetrocked ceiling of the common area. Although it is not clear in the evidence as to when the building was constructed, it is undisputed that the individual respondents, as subsequent owners, did not construct it. Thus, cases such as *Theis v. Heuer*, 149 Ind.App. 52, 270 N.E.2d 764 (1971), where the warranty of habitability was applied because of a contractual relationship between a builder-vendor and vendee; *Barnes v. MacBrown and Co., Inc.*, 342 N.E.2d 619 (Ind.1976), where the implied warranty was extended from the builder-vendor to second or subsequent purchasers of a dwelling house where the latent defect later appears; and the latent defect case in *Smith v. Old Warson Development Company*, 479 S.W.2d 795 (Mo.banc 1972), applying the implied warranty from a builder-vendor are illustrative of the notice of the defect requirement. The reason is stated in the *Old Warson* case to be, "However, it should be recognized that the rationale for allowing recovery by a pur-

chaser of a new house, on a theory of breach of an implied warranty of habitability or quality, is applicable *only* against that person *who not only had an opportunity to observe* but failed to correct a structural defect, which, in turn, became latent, i. e., the builder-vendor." (479 S.W.2d 801) [Italics added.] The court in the *Old Town* case, supra, loc. cit. 349 N.E.2d 776[15], adhered "to the principle established in other jurisdictions requiring prior notice (either actual or *constructive*) and an opportunity to repair as prerequisites to breach of the implied warranty of habitability." The court said further, "In following such a course, it is recognized that presuming notice (constructive notice) of a latent defect is in itself a form of *limited* strict liability in contract." In *Old Town*, however, the court found, through a process of piercing corporate veils, that there was evidence justifying the jury in finding that *Old Town* possessed constructive knowledge of latent defects in plaintiff's apartment, and also that it was a *builder-owner*, in a position to have knowledge of defects in plaintiff's apartment. Hence, the court found that *Old Town* had breached its implied warranty of habitability, following the quotation from Professor Love, 1975 Wis.L.Rev., p. 125 "Landlord's Liability for Defective Premises: Caveat Lessee, Negligence or Strict Liability?": If the landlord constructed the premises or supervised their construction, he should be *presumed to have knowledge of any latent defects in the original construction of the building.*"

Under the facts of this case, and the status of the law at this time, there seems to be no legitimate basis for imposing liability upon respondents just by reason of their existent implied warranty of habitability of the leased premises. No case has been cited, nor has one been found, imposing strict liability upon the non-builder landlord for latent defects, rendering the premises unsafe or dangerous, absent some actual or constructive notice or knowledge of the defects. This notice requirement would seem to reduce the concept of implied warranty of habitability to one of negligence [see the

concurring opinion in *Old Town*, supra, 349 N.E.2d 789, 790, and the comment on that case, 10 Ind.L.Rev. 591, 630 (1977)]. Nevertheless, the concept of implied warranty of habitability by prevailing authority, including the *Old Town* and *Old Warson* cases, supra, includes the requirement of some type of notice of defects. There is no evidence in this case of any notice of any kind of the defective condition of the wiring in the basement common area, hence the trial court did not err in sustaining respondents' after-trial motion and entering judgment for them in accordance with their motion for directed verdict made at the close of the whole case.

The judgment is affirmed.

All concur.