No. 126,456

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

WASHBURN SOUTH APARTMENTS LLC,
*Appellee*,

v.

KIA HESSION,
*Appellant*.

SYLLABUS BY THE COURT

1.

The Kansas Residential Landlord and Tenant Act, K.S.A. 58-2540 et seq., defines the legal duties of tenants and landlords in residential leases, regardless of the terms of a rental agreement. Among other duties, a landlord must provide habitable housing—that is, the landlord must reasonably maintain any common areas, provide a housing unit that complies with all material health and safety codes, and ensure that the housing unit is generally safe with adequate electricity, plumbing, sanitation, heat, and ventilation.

2.

Although Kansas law permits landlords to contractually shift some of their duties to tenants in limited circumstances, the legal duty to provide habitable housing—codified in K.S.A. 58-2553(a)(1) through (3)—may not be delegated or waived.

3.

A tenant claiming a landlord has breached its duty to provide habitable housing raises a breach-of-warranty claim and may recover damages suffered due to the breach. The primary measure of damages is the difference between the fair rental value of the apartment and the amount the tenant paid. The tenant may also recover consequential

damages that arose from the breach or damages that may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach.

4.

When a tenant has not paid their monthly rent, K.S.A. 58-2564(b) permits a landlord to terminate a rental agreement after providing a written notice to the tenant of the deficiency and allowing the tenant to pay the missed rent within three days.

5.

A rental agreement for a residential housing unit is a contract between the landlord and tenant that includes—either implicitly or explicitly—the requirements of the Residential Landlord and Tenant Act. A violation of the Act is both a statutory violation and a breach of contract.

6.

There is an implicit duty in every contract for each party to perform their contractual obligations in good faith. This duty of good faith means, among other things, that a party will not intentionally or purposely do anything to prevent another party from carrying out their obligations under the agreement. As a corollary, a party to a contract may not refuse to permit another person to perform their obligations and later claim that the person has breached the agreement through that nonperformance. Whether the duty of good faith has been breached and whether that breach caused damage to another contracting party are questions of fact.

Appeal from Shawnee District Court; DIANE GLYNN, judge pro tem. Submitted without oral argument. Opinion filed June 6, 2025. Reversed and remanded with directions.

*Rebekah Gaston*, of Kansas Holistic Defenders, of Lawrence, for appellant.

No appearance by appellee.

Before ISHERWOOD, P.J., WARNER and HURST, JJ.

WARNER, J.: Most residential leases in Kansas are governed by the Kansas Residential Landlord and Tenant Act (commonly called the RLTA). See K.S.A. 58-2540 et seq. The RLTA establishes rights and responsibilities of landlords and tenants that cannot be waived by a rental contract. For example, tenants must comply with applicable health and safety ordinances and keep their housing unit reasonably safe and clean. See K.S.A. 58-2555. And landlords must provide housing that meets minimum habitability requirements, meaning the housing must comply with applicable building and housing codes affecting health and safety. See K.S.A. 58-2553(a).

This case arises at the intersection of a landlord's legal duty to provide habitable housing and a tenant's contractual duty to pay their rent. In 2022, Kia Hession was renting an apartment from Washburn South Apartments in Topeka. Hession did not make her monthly rent payment in October 2022. Later that month, Washburn South filed this lawsuit seeking to evict her and recover the past-due rent. Hession counterclaimed, arguing her apartment did not meet minimum habitability requirements and asserting this case was filed in retaliation for Hession's communications regarding the apartment's condition with the City of Topeka and a housing-assistance program.

After an abbreviated trial, the court ruled in Washburn South's favor, finding Hession owed her unpaid rent plus interest. (Hession had moved out of the apartment while the case was pending.) Hession appeals, arguing the court's judgment was based on incorrect interpretations of the RLTA. After carefully reviewing the record, we agree with Hession that the court's ruling was based on errors of law. We therefore reverse the trial court's judgment and remand the case for a new trial.

3

Hession and her one-year-old daughter moved into an apartment at Washburn South in November 2019 and lived there for three years. On June 8, 2022, Hession renewed her lease for one year. The new lease stated that Hession would pay Washburn South monthly rent of $550, due the first day of each month. The lease also stated that Hession accepted her apartment "as is."

Hession's rent was subsidized through the Shelter Plus Care housing-assistance program. In August 2022, the program notified Hession that it was terminating its assistance voucher at the end of September because Hession's apartment did not meet the program's minimal habitability standards. Hession had 38 days after receiving notice of the voucher's termination to find a new apartment that would accept a voucher or lose access to that assistance. But she was unable to find another suitable apartment before the end of September and was also unable to pay the monthly rent to Washburn South by October 1 on her own.

On October 4, Washburn South posted a notice on Hession's apartment door that she must pay her rent or vacate the apartment in three days, or else be evicted from the apartment. Two days later, a representative from Doorstep (a local nonprofit organization) contacted Washburn South with questions about how it could pay Hession's rent. Washburn South's property manager, Crystal Orcutt, told the representative that the apartment complex would not accept the payment. Hession did not otherwise pay the rent within three days of the notice, but she remained in the apartment.

On October 17, Washburn South petitioned to evict Hession and collect the unpaid rent. Hession filed a written answer to the petition. She noted that the Doorstep representative had attempted to pay her October rent within the three-day period covered by the apartment complex's notice, but Washburn South had rejected the offer of

4

payment. Hession also asserted two counterclaims: first, that Washburn South violated the RLTA by breaching its warranty of habitability under K.S.A. 58-2553 and second, that Washburn South's attempt to evict Hession was in retaliation for Hession reporting code violations to the City of Topeka—a violation of K.S.A. 58-2572. About two months later, the apartment complex filed an answer denying Hession's allegations.

*The trial*

The court scheduled a bench trial for the eviction case on December 27, 2022. Hession moved out of the apartment weeks before the trial date. The day of the trial, the court consulted with the parties to see whether they wished to proceed with their claims since Hession was no longer living at Washburn South. After a few minutes of discussion, Hession indicated that she would like to proceed with a hearing that day on the remaining issues in the case—whether and to what extent any rent was owed by Hession and whether she had suffered and was entitled to damages under the RLTA.

Washburn South's property manager, Orcutt, testified that Hession renewed her lease agreement on June 8, 2022, at a monthly rate of $550, due the first of each month. She stated that Hession did not pay the October rent, and so Orcutt posted the three-day notice to Hession's door on October 4. Orcutt acknowledged that someone from Doorstep contacted her on October 6 to pay Hession's October rent, but she stated that she told the representative that Washburn South was "going through evictions and not accepting payment from Ms. Hession." The judge asked Orcutt whether she would have accepted any rent payment from Hession before October 7, and Orcutt replied that the owner of the apartment complex had instructed her not to accept any payment from Hession.

Hession's witnesses focused on the state of her apartment and the steps she had taken to mitigate some of her health and safety concerns. Nathan Dykeman, a code enforcement inspector for the City of Topeka, and Greg McGivern, a housing inspector

with the Shelter Plus Care housing-assistance program, both testified about the deficiencies they found when they inspected the apartment in the summer of 2022:

- Dykeman inspected Hession's apartment in June and August. He found several code violations during his June inspection and summarized these in a letter to Hession and Washburn South. The letter included 8 categories of violations and 27 photographs showing the deficiencies. Dykeman testified that when he returned in August, several of the code violations remained unchanged, and he observed no indication that anyone had attempted to address them.

- McGivern conducted an inspection of Hession's apartment in July and found several conditions that violated the standards set by Shelter Plus for rental assistance. For example, the front door was damaged and not operating properly, and the front window was taped together. McGivern detailed his findings in a letter to Washburn South and Hession. When McGivern returned for a follow-up inspection in August, none of these issues had been fixed.

Hession also testified, describing multiple issues that arose during the three years she lived at Washburn South. These issues included:

- Leaking water and mold in the bathroom,
- Excessive moisture in the air,
- Wet and dirty carpet,
- Holes in the floorboards,
- Cracks in the windows, and
- Significant insect infestation.

Hession had reported these issues to Washburn South, submitting 8 written and 12 verbal reports. Hession testified that maintenance staff would come and look at the items needing repairs, but no one came back to make the repairs or follow up with Hession. She stated that she complained to the City of Topeka, the Shelter Plus Care housing-assistance program, and the Department of Housing and Urban Development about these issues and Washburn South's lack of responsiveness.

Hession testified that when Washburn South did not address these issues, she purchased several different cleaning products—shampoos, vacuums, and cleaning solutions—to address the carpet problems. Hession explained that she had to clean each section of carpet in her apartment once or twice per month and when she did so, the water released from the carpet was a dark gray color and smelled bad. Needing a fix that did not require time-consuming cleaning, Hession purchased rugs to cover the carpet so her daughter did not have to crawl on the dirty floor. She also purchased a dehumidifier to reduce the excessive moisture level in the air. And she bought plastic containers to store the clothing for her and her daughter to prevent it from taking on the odor of the apartment. Hession testified that she believed the apartment's condition warranted no more than $200 per month in rent.

Before Hession concluded her testimony, the court asked if Hession had given a 14-30 day notice to the landlord—a formal notice that she would be dissolving the lease if the landlord did not cure these conditions. Hession responded that she never provided any formal notices of these conditions to Washburn South. The court indicated that this did not prevent her from bringing her counterclaim, but it found that Hession could only assert a claim for damages that was "tied to the lease that is related to this eviction" for the rental period beginning June 8, 2022.

*The end of the trial and the court's ruling*

During Hession's testimony, the court became concerned that Hession's trial was taking too long given the other hearings scheduled for that day. The court told the parties that the trial had taken more than 90 minutes, and there were "14 more trials waiting in the hallway." Hession's lawyer suggested that the parties could finish presenting their evidence another day, but the court rejected that suggestion. After Washburn South concluded its cross-examination of Hession, the trial court ended the hearing "[i]n the interest of time." The court thus did not allow Hession's attorney any redirect examination and did not allow either party a closing argument or to provide an oral or written summation of the legal claims.

The court found that Hession owed Washburn South $1,011.94 plus interest—the full amount requested by the apartment complex. The court then ruled against Hession on each of her counterclaims:

- The court found that Hession could not prevail on her claim that the apartment was uninhabitable, as she "knew the circumstances" and the condition of the apartment when she renewed her lease in June 2022 and took the apartment "as is." (The court indicated that the rental agreement stated Hession took the apartment "as is," but that agreement is not included in the record.) The court also found that Hession had not provided any "admissible evidence" of damages relating to the habitability of the apartment.

- The court found that the Doorstep representative had not tried to make an actual payment—but rather asked how that payment should be made—so Hession had not shown that Washburn South declined any payment between October 4 and October 7. And it found that whether Washburn South had wrongfully sought to evict her was moot because she had since moved out of the apartment.

8

- The court found that there was no evidence that Washburn South retaliated against Hession based on her previous reports to the City or to Shelter Plus regarding the state of the apartment. The court indicated that Hession had an obligation to show that Washburn South retaliated by either "increasing the rent or decreasing services," and she had not done so.

Hession appeals.

DISCUSSION

The RLTA governs the relationship between landlords and tenants in residential housing in this state. The RLTA codifies several substantive rights and responsibilities of landlords and tenants, defines when either party to a rental agreement may end that lease, and defines when and how a landlord may evict a tenant from a housing unit. This appeal concerns two of the RLTA's provisions:

- K.S.A. 58-2553(a) states that a landlord has a legal duty to provide housing that meets minimal habitability requirements; and

- K.S.A. 58-2564(b) states that a landlord must give a tenant three days to pay any unpaid rent before evicting them from a housing unit.

The trial court found that these provisions had no bearing on Hession's case, and Hession now challenges several aspects of that ruling. She claims the court erred when it concluded that the rental agreement's statement that Hession was leasing the apartment "as is" relieved Washburn South of its legal duty to provide habitable housing under K.S.A. 58-2553(a). Hession also asserts that the court's finding that she had not paid her October rent within three days of receiving the eviction notice was unsupported by the

9

record, as the apartment manager testified that the owner would not accept any payment offered on Hession's behalf. Lastly, Hession claims that the court's decision to cut the trial short—not allowing any redirect examination by her attorney in presenting her counterclaims or closing argument—violated her right to due process of law. Washburn South remains a party to this appeal but did not file a brief.

After carefully reviewing the record and Hession's arguments, we agree that the trial court's ruling was based on incorrect interpretations of K.S.A. 58-2553(a) and K.S.A. 58-2564(b). We thus reverse the judgment for Washburn South and remand for a new trial consistent with this opinion.

1. *The landlord's legal duty to provide habitable housing under K.S.A. 58-2553(a)(1) through (3) may not be waived by a rental agreement.*

The RLTA establishes legal duties of every tenant and landlord in a residential lease, regardless of the terms of the rental agreement. Relevant here, the RLTA requires a landlord to reasonably maintain any common areas, to provide housing that complies with all material health and safety codes, and to ensure that the housing is generally safe with adequate electricity, plumbing, sanitation, heat, and ventilation. K.S.A. 58-2553(a)(1)-(3); *O'Neill v. Dunham*, 41 Kan. App. 2d 540, Syl. ¶ 6, 203 P.3d 68 (2009).

Although Kansas law permits landlords to contractually shift some of their duties to tenants in limited circumstances, the duties listed in K.S.A. 58-2553(a)(1) through (3) may not be delegated or waived. See K.S.A. 58-2549; *Joe v. Spangler*, 6 Kan. App. 2d 630, 632, 631 P.2d 1243 (1981); see also K.S.A. 58-2553(b) (noting that sections [a][4] and [a][5] may be contractually delegated to the tenant if the landlord acts in good faith and not for the purpose of evading responsibilities under the Act). Courts describe these nondelegable responsibilities as the duty to provide habitable housing. See *Love v. Monarch Apartments*, 13 Kan. App. 2d 341, 345, 771 P.2d 79 (1989).

K.S.A. 58-2559 provides tenants with two remedies when a landlord breaches this legal duty: terminating the rental agreement (K.S.A. 58-2559[a]) and recovering damages caused by the landlord's breach (K.S.A. 58-2559[b]). These remedies may be pursued collectively or individually. See K.S.A. 58-2559(b). A tenant who seeks to end the lease can only do so 30 days after they have provided a written notice to the landlord detailing the deficiencies and the landlord has not made a good-faith effort to repair or otherwise address the situation within 14 days. See K.S.A. 58-2559(a). But these formal notice requirements relating to lease termination do not apply to or otherwise restrict a tenant's ability to seek damages for a landlord's actions under K.S.A. 58-2559(b). See *Love*, 13 Kan. App. 2d at 345.

Hession argued in her answer and counterclaims that Washburn South breached its legal duty by providing an apartment that violated several aspects of the Topeka building code. At the trial, the inspectors for the City and the Shelter Plus Care housing-assistance program described the dismal state of the apartment where Hession had lived. Washburn South did not dispute these accounts, though it pointed out Hession had not provided the 14-30 day notice in K.S.A. 58-2559(a) necessary to terminate the rental agreement.

In its ultimate ruling, the trial court correctly noted that the absence of a written notice only prevented Hession from terminating the rental agreement, not from pursuing her counterclaim for damages or offsetting any damages claimed by Washburn South. Yet the court found that Hession had waived these code violations and the apartment's other habitability problems when she renewed her lease in June 2022, emphasizing that the lease stated that Hession was accepting the apartment "as is." The court also found that Hession had offered "no admissible evidence" of damages she incurred due to the apartment's condition.

11

Hession challenges both conclusions. She notes that Kansas law does not permit landlords to delegate their responsibilities to provide housing that meets minimum habitability standards. And she asserts that she offered evidence of compensable damages suffered from the landlord's breach of that duty. We agree.

*First*, Kansas law does not allow a landlord to delegate or shift its legal duty to provide a residence that meets basic habitability standards. The RLTA unequivocally states that "[a] rental agreement . . . may not permit the receipt of rent free of the obligation to comply with subsection (a) of K.S.A. 58-2553"—the landlord's duty to provide habitable housing. K.S.A. 58-2549. Rental agreements may not waive legal rights of remedies under the RLTA unless that waiver is explicitly permitted by the Act's provisions. K.S.A. 58-2547(a); see, e.g., K.S.A. 58-2553(b) (allowing some landlords to contractually shift obligations in K.S.A. 58-2553[a][4] and [5] in certain circumstances). In other words, the duty to provide habitable housing is not waived even when a tenant "had prior knowledge of the defects" of the residence. *Spangler*, 6 Kan. App. 2d at 632.

Thus, the trial court erred when it found that Hession had waived any objection to the state of the apartment when she renewed her lease in June 2022. Kansas law does not allow Washburn South to contract away its legal obligations under the RLTA to provide habitable housing. And any effort by Washburn South to shrug that obligation via its rental agreement is void and unenforceable. See K.S.A. 28-2547(b).

This error manifested in at least two ways in the court's ultimate ruling: The court erroneously concluded that Hession was precluded from asserting her defense and counterclaims that Washburn South had breached its duties under the RLTA. And the court erroneously found that it could not consider any evidence of Washburn South's breach of its duty to provide habitable housing before Hession renewed her lease in June 2022. These incorrect conclusions, rooted in a legal error, permeate the court's evaluation of both Washburn South's claim for damages and Hession's counterclaims.

12

*Second*, the trial court's alternative conclusion that Hession had not provided *any* evidence of damages is not supported by the record. The court found that Hession had provided "no admissible evidence" of damages, emphasizing at the trial that the court believed it "need[ed] to see money to be able to actually award damages." And it noted that although Hession had provided some receipts for purchases she had made before she renewed her lease, the court would not consider that evidence. In the end, the court explained that K.S.A. 58-2572(a) requires a tenant to show that their landlord retaliated against them "by increasing rent or decreasing services," and found that Hession had not provided any evidence of either action.

Kansas courts have long recognized that a tenant who claims a landlord has breached its duty to provide habitable housing raises a contractual breach-of-warranty claim and may recover damages suffered due to the breach. *Steele v. Latimer*, 214 Kan. 329, Syl. ¶ 9, 521 P.2d 304 (1974); see *Love*, 13 Kan. App. 2d at 345-46. The primary measure of damages is the difference between the fair rental value of the deficient apartment and the amount the tenant actually paid. See 13 Kan. App. 2d at 345-46. The tenant may also recover consequential damages that arose "'from the breach itself,'" or damages that "'may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach.'" 13 Kan. App. 2d at 346.

Hession offered evidence that she suffered damages from living in the dilapidated apartment. She testified that she believed that her current apartment could only be rented for $200 per month—$350 per month under the amount required by her rental agreement. Cf. *In re Acquisition of Property by Eminent Domain*, 299 Kan. 37, 46, 320 P.3d 955 (2014) (property owner may testify to the fair market value of property if they explain their rationale and demonstrate it is reasonable). Hession also described consequential damages she claimed to have suffered—she was required to purchase multiple rugs and cleaning supplies to try to provide a habitable space for herself and her daughter. And,

13

Hession argues, the landlord's refusal to address the condition of the apartment caused her to lose the housing assistance that had allowed her to afford to live there in the first place.

The trial court did not state that it found this testimony unreliable, nor did it state that it found the evidence unpersuasive. Instead, it ruled that Hession had offered "no admissible evidence" of her damages—a conclusion that is unsupported by the record. Again, this error undermines the trial court's ruling and requires a new trial.

2. *Refusing to accept a rental payment offered on Hession's behalf during the three-day window in K.S.A. 59-2564(b) raises a factual question whether the landlord was carrying out its duties under the RLTA in good faith.*

Hession next argues that the trial court misinterpreted K.S.A. 58-2564(b) when it found Washburn South did not breach its duties under the RLTA by refusing to accept a payment on Hession's behalf before initiating its eviction action. Though we have already concluded that we must reverse and remand the trial court's judgment, consideration of this question is necessary to help constrain the issues and arguments during the next trial.

The facts underlying Hession's argument are largely undisputed. Washburn South posted a notice at Hession's apartment on October 4, indicating she had three days to pay her October rent or an eviction case would be filed against her. On October 6, a representative from Doorstep contacted the property manager about paying Hession's rent. The property manager informed the representative that Washburn South would not accept any payment of Hession's rent. At trial, the court asked the property manager whether she would have accepted any payment of rent during that three-day period; the property manager responded that the owner of the apartments had instructed her not to accept any payment and to move forward with an eviction action.

14

Hession asserts that her October rent would have been paid by Doorstep if the property manager had not thwarted Doorstep's payment attempt. In other words, the apartment complex refused an offer of rent—and never intended to accept any rent—on Hession's behalf. Hession asserts that Washburn South was using K.S.A. 58-2564(b)'s notice requirements as a box to be checked rather than a genuine window to allow Hession to cure her missed payment. The trial court found that no payment had been made, and even if it had, whether Washburn South could evict Hession was moot because she had moved out of the apartment by the time of the trial.

K.S.A. 58-2564 establishes when and under what conditions a landlord may terminate a rental agreement—outlining the steps that must be taken before an eviction case is filed. When a tenant has not paid their rent, a landlord may terminate a rental agreement after the landlord provides a written notice to the tenant of the deficiency and allows three days for the tenant to pay the outstanding rent. K.S.A. 58-2564(b). A landlord who unconditionally accepts late rent waives the right to take any action for that breach. See K.S.A. 58-2566. But if a tenant does not pay the rent within three days of receiving the notice, the rental agreement is dissolved, and the landlord may take additional legal action—such as filing a lawsuit to seek possession of the residence or damages from the tenant's breach. See K.S.A. 58-2568; see also K.S.A. 61-3803 (landlord may file an eviction action after providing 72 hours' notice that the tenant must leave the premises).

Hession's rent was not paid between October 4—when Washburn South posted its notice—and October 7. Washburn South correctly pointed out at trial that the language of K.S.A. 58-2564(b) does not include any wiggle room in the payment deadline. But Hession asserts that it would be inequitable to allow a landlord to thwart a genuine effort to make a rent payment and then proceed with an eviction action.

A rental agreement is a contract between the landlord and tenant that includes—either implicitly or explicitly—the requirements of the RLTA. See K.S.A. 58-2547(a) (noting a rental agreement may not seek to waive the requirements of the RLTA); see also *Clark v. Walker*, 225 Kan. 359, 363-64, 590 P.2d 1043 (1979) (discussing the origin and broad application of the RLTA). But see K.S.A. 58-2541 (listing specific residential leases to which the RLTA does not apply). Thus, a violation of the RLTA is both a statutory violation and a breach of contract. *Love*, 13 Kan. App. 2d at 345-46.

There is an implicit duty in every contract for each party to perform their contractual obligations in good faith. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 965, 298 P.3d 250 (2013). This duty of good faith means, among other things, that a party will not intentionally or purposely do anything to prevent another party from carrying out their obligations under the agreement. As a corollary, a party to a contract may not refuse to permit another person to perform their obligations and later claim that the person has breached the agreement through that nonperformance. *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987). Whether the duty of good faith has been breached and whether that breach caused damage to another contracting party are questions of fact. See *Waste Connections*, 296 Kan. at 965.

The trial court's questions to the property manager during her testimony demonstrated a recognition that parties to residential leases, like other contracts, have a duty to act in good faith. But the court made no findings as to whether Washburn South had breached that duty by refusing Doorstep's offer of rent on October 6, essentially concluding Hession had not been damaged by the filing of the eviction since she later left the premises. But this conclusion failed to appreciate Hession's other arguments—that the eviction action itself was wrongful and pursued as retaliation for the actions taken by the City and Shelter Plus regarding the health and safety concerns at the apartment complex. Hession asserts that Washburn South made the filing of this lawsuit possible when it

16

refused to accept any payment on her behalf in October 2022; before that time, Hession was current on her rent payments.

Our review of the record is consistent with Hession's characterization of these events. The trial court found that Hession had not been damaged by Washburn South's refusal to accept any October rent payment offered on her behalf while also finding that Hession's retaliation counterclaim was precluded by her failure to pay that rent. Thus, the trial court's judgment was the result of circular analysis—refusing to consider the reason why Hession's October rent was not paid but relying on that nonpayment to deny her retaliation counterclaim—and was based on an incomplete assessment of the law and evidence.

To address these concerns on remand, the trial court should consider (1) whether Washburn South would have accepted any payment made on Hession's behalf before October 7, (2) whether Washburn South prevented Doorstep from making payments on Hession's behalf or refused an offer of payment, and (3) whether Washburn South was retaliating against Hession's complaints to the City and Shelter Plus.

3. *Because we remand this case for a new trial, we need not consider Hession's remaining due-process argument.*

In her final claim on appeal, Hession argues that the way the court concluded the trial violated her constitutional right to due process of law. She points out that the court, realizing it was pressed for time because several other trials were scheduled that day, abruptly cut the hearing short. In doing so, the court did not allow Hession's counsel any redirect examination of Hession—even though she had asserted counterclaims against Washburn South and had the burden to prove and persuade the court as to her assertions. The court also did not allow closing arguments regarding the parties' claims or counterclaims—it merely announced its ruling from the bench once Hession left the

17

stand. According to Hession, these actions collectively deprived her of her right to procedural due process, which requires an opportunity to be heard "at a meaningful time and in a meaningful manner." See *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007).

When a person's due-process rights have been violated, the appropriate remedy is to reverse the resultant judicial action and remand for a new hearing that provides the appropriate procedural safeguards. See *In re J.O.*, 43 Kan. App. 2d 754, 763, 232 P.3d 880 (2010). Here, we have already determined that we must reverse the trial court's judgment and remand the case for a new trial. Thus, consideration of Hession's procedural challenge is unnecessary and would have no practical effect on the outcome of this appeal.

But before closing, we pause to comment on the consequences of these truncated trial procedures. Regardless of whether the court's trial procedure fell short of the duty to provide a meaningful opportunity to be heard, many of the errors in this case could have been avoided if the trial had not ended in such an abrupt manner and without the benefit of written or oral legal arguments from the parties.

We acknowledge that the court had scheduled several trials on its docket the afternoon that Hession's trial took place, and that this is often a necessary practice to meet aggressive timelines for eviction cases set by Kansas statutes. See, e.g., K.S.A. 61-3805 (summons in an eviction case must provide a date the tenant must file an answer or appear at an answer docket, and this date must be 3 to 14 days after the petition was filed); K.S.A. 2024 Supp. 61-3807(a) (court should conduct the eviction trial within 14 days after the date listed in the summons). The trial court here was in a difficult spot, needing to balance the need for a full evidentiary hearing with other competing considerations.

18

But this bind was not inevitable. The court recognized at the outset of the trial that these tight deadlines were no longer binding, as Hession had moved to a different residence. The court was aware that this case involved counterclaims and testimony from multiple witnesses. Before the start of trial, the court consulted with the parties, who ultimately opted to proceed rather than continue the case to a different date. But it is clear from the record that the court remained concerned about the other trials scheduled for that day. And it is the court—not the parties—that has ultimate control over its docket. See *Holt v. State*, 290 Kan. 491, 498, 232 P.3d 848 (2010).

A court should, to the extent practicable, schedule time for a trial that allows the court to consider the claims and counterclaims presented. Here, in an effort to conduct the trial in a condensed manner so it could hear other scheduled cases, the court issued a ruling based on an incorrect interpretation and application of K.S.A. 58-2553(a) and K.S.A. 58-2564(b). And now that case must be retried. We reverse the district court's judgment and remand for a new trial, consistent with the law discussed in this opinion.

Reversed and remanded with directions.